HIBBING TACONITE CO., a joint venture, Appellant,

v.

MINNESOTA PUBLIC SERVICE COMMISSION, Respondent,

and

MINNESOTA POWER & LIGHT COMPANY, Respondent,

v.

MINNESOTA PUBLIC SERVICE COMMISSION, Appellant.

Nos. 50513, 51103 and 50500.

Supreme Court of Minnesota.

Dec. 12, 1980.

Rehearing Denied Feb. 17, 1981.

Mackall, Crounse & Moore and Robert S. Lee, Minneapolis, Squire, Sanders & Dempsey and Alan P. Buchmann, Cleveland, Ohio, for Hibbing Taconite Co.

Frank Hartman, Atty., Pickands Mather & Co., Cleveland, Ohio, for Erie Mining Co.

Warren Spannaus, Atty. Gen., Jerome L. Getz, Deputy Atty. Gen., Rodney A. Wilson, Sp. Asst. Atty. Gen., and Jean Heilman, Asst. Atty. Gen., Peter H. Grills, Sp. Asst. Atty. Gen., St. Paul, for Minnesota Public Service Commission.

Briggs & Morgan, Samuel L. Hanson and R. Scott Davies, Minneapolis, James R. Habicht, Duluth, for Minnesota Power & Light Co.

John Huges, Senior Citizens Coalition of N.E. Minn., Duluth, William E. Ojala, Senior Citizens Coalition of Duluth, Gilbert, for respondents.

Robert W. Johnson, St. Paul, amicus curiae.

TODD, Justice.

Minnesota Power & Light Company (MPL) filed a notice of rate change with the Minnesota Public Service Commission (PSC) on April 5, 1977. Following statutory procedure, the rate increase was suspended, then reinstated, subject to refund, and hearings commenced August 15, 1977, before a hearing officer. The report of the hearing officer was accepted in part and rejected in part by the PSC, and its order allowing rate increases was filed on February 3, 1978. Supplemental orders were filed on June 19, 1978, and July 10, 1978. Hibbing Taconite Co. (Hibbing), one of the intervenors in the proceeding, and MPL ap-

pealed to the district court. The trial court affirmed the PSC's rate allocation determination, but reversed and remanded to the PSC its determination of MPL's rate of return on common equity. We affirm with modification.

MPL, a public utility, services about 91,000 customers in the State of Minnesota. Its customers can be classified as: (1) Residential, (2) general service, (3) large light and power, (4) large power, (5) municipal, and (6) lighting. The large power class purchases 58 percent of MPL's entire system power. The taconite industry accounts for approximately 84.5 percent of MPL's total operating revenues within the large power class. Moreover, during the mid–1970's, MPL began a construction program to accommodate the local taconite industry's projected expansion. MPL's growth in plant investment represented the largest percentage increase of any United States utility. During 1976–1977, 96 percent of MPL's growth in output resulted from large power class sales, while only 0.4 percent of the growth was attributable to the residential class. Hibbing, a large power customer of MPL, purchases approximately 10 percent of all power generated by MPL.

The hearing officer conducted extensive rate case proceedings and issued recommendations to the PSC which provided, in part, that:

1. MPL's appropriate rate base is $359,986,237.

2. MPL should be authorized to partially discontinue capitalization of "allowance for funds used during construction" (AFDC).

3. The appropriate rate of return on common equity is 12.75 percent with partial discontinuance of capitalization of AFDC.

4. MPL's appropriate overall rate of return is 9.73 percent.

5. A rate design should be adopted allocating MPL's increased revenues and expenses among the various classes of customers on the basis of the recent past and projected future demands of the respective classes.

6. The rate base should exclude costs of the Floodwood-Fine Lakes utility project.

7. The rate base should include "construction work in progress" (CWIP) for the Coyote generating plant.

8. MPL is entitled to an annual revenue increase of $29,278,651.

9. MPL's proposed amount of charitable donations should be allowed as legitimate rate case expenses.

The PSC upon receipt of the hearing officer's report conducted further proceedings and concluded, in part, that:

1. MPL's appropriate rate base is $358,244,783.

2. Full capitalization of AFDC is required since MPL's circumstances did not warrant partial discontinuance of capitalization of AFDC.

3. MPL's appropriate overall rate of return on common equity is 13 percent with full capitalization of AFDC.

4. The appropriate overall rate of return for MPL is 9.825 percent.

5. The rate allocated to the residential class shall be less than the overall rate of return and the large power class shall make up the deficit.

6. The rate base shall exclude the expenses of the Floodwood–Fine Lakes utility project.

7. MPL's rate base shall exclude CWIP for the Coyote generating plant.

8. MPL is entitled to an annual revenue increase of $25,229,656.

9. MPL's charitable donations are not allowable rate case expenses.

Hibbing and MPL appealed the PSC's decision to the district court. The trial court remanded the case to the PSC for consideration in accordance with the trial court's holding that:

1. The appropriate range for MPL's rate of return on common equity was 13.25 to 14 percent.

2. Charitable deductions are allowable rate case expenses in accordance with a policy reversal by the PSC.

3. Substantial evidence existed supporting the exclusion of certain construction expenses from the Floodwood–Fine Lakes utility project and the Coyote generating plant.

4. The rate allocation established by the PSC must be affirmed since no abuse of discretion was found.

The PSC appeals from that part of the decision which sets aside the PSC's determination that 13 percent was a proper return on equity. Hibbing appeals from that portion of the order approving the rate allocation established by the PSC. MPL has filed a notice of review on the denial of expense allowance on the Floodwood–Fine Lakes utility project and the Coyote generating plant. Although we affirm the result reached by the trial court, its finding as to the appropriate range for MPL's rate of return on common equity is not binding on the PSC on remand.

The issues on appeal are:

1. Did the trial court err in reversing the PSC's determination of MPL's rate of return on common equity?

2. Did the trial court err in affirming the PSC's allocation of rates?

3. Did the trial court err in affirming the PSC's order to exclude certain construction expenses from the rate base?

1. A public utility is subject to a variety of state and federal controls and regulations. The state possesses the authority to regulate the rates a utility may charge to its customers. The Minnesota Legislature has adopted various statutes to accomplish this authority and has assigned responsibility for the performance of this function to the PSC. Minn.Stat. § 216A.05, subd. 1 (1978), provides that the PSC has both legislative and quasi–judicial powers. Within certain established guidelines the court has the authority to review the rate case proceedings that the PSC conducts. When reviewing the PSC's legislative and quasi–judicial functions, the court must apply two different scopes of review. In *St. Paul Area Chamber of Commerce v. Minnesota Public Service Commission*, 312 Minn. 250, 262, 251 N.W.2d 350, 358 (1977), this court held:

(a) When the Public Service Commission acts in a judicial capacity as a fact-finder, receives evidence in order to make factual conclusions, and weighs that evidence as would a judge in a court trial, it will be held on review to the substantial evidence standard.

(b) When the Public Service Commission acts in a legislative capacity as in rate increase allocations, balancing both cost and noncost factors and making choices among public policy alternatives, its decision will be upheld unless shown to be in excess of statutory authority or resulting in unjust, unreasonable, or discriminatory rates by clear and convincing evidence.

Although the court has set forth these general principles, when considering rate cases the court has not been precise in its use of terminology. The single term "rate-making" has been used to describe what is really two separate functions–(1) the establishment of a rate of return, which is a quasi–judicial function, and (2) the allocation of rates among various classes of utility customers, which is a legislative function. The court's failure to be more precise when discussing the two phases of ratemaking has led to the inappropriate statement that "ratemaking is a legislative process."

The *St. Paul Chamber* case enunciated the PSC's two functions and the related standards of review. In applying those standards, we now hold that the establishment of a rate of return involves a factual determination which the courts will review under the substantial evidence standard. When the PSC allocates rates among classes of customers, it acts in a legislative capacity and the courts will uphold the PSC's decision unless it exceeds the PSC's statutory authority or results in unjust, unreasonable, or discriminatory rates by clear and convincing evidence. Here, the trial court correctly concluded that it should apply the substantial evidence test when reviewing the PSC's determination of MPL's rate of return.

In any rate case, when the PSC performs its first function and determines the appropriate rate of return for the regulated utility, the PSC establishes the dollar amount which the utility is allowed to earn on its investment. The PSC is bound to follow certain legal criteria in establishing a rate of return. Minn.Stat. § 216B.03 (1978) provides in pertinent part:

Every rate made, demanded, or received by any public utility * * * shall be just and reasonable. Rates shall not be unreasonably preferential, unreasonably prejudicial or discriminatory, but shall be sufficient, equitable and consistent in application to a class of consumers.

Minn.Stat. § 216B.16, subd. 6 (1978), states in part:

The commission, in the exercise of its powers under this chapter to determine just and reasonable rates for public utilities, shall give due consideration to the public need for adequate, efficient, and reasonable service and to the need of the public utility for revenue sufficient to enable it to meet the cost of furnishing the service, including adequate provision for depreciation of its utility property used and useful in rendering service to the public, and to earn a fair and reasonable return upon the investment in such property.

This court has set forth certain guidelines for the PSC to follow in determining an appropriate rate of return.

The process by which rates are fixed is, first, to determine the value of the company's property represented by the equity of its stockholders; second, to establish a fair rate of return which will provide earnings to investors comparable to those realized in other businesses which are attended by similar risk, will allow the company to attract new capital as required, and will maintain the company's financial integrity; and, third, to compute corporate taxes, depreciation reserves, and other expenses of operating the company. The rates charged subscribers are thereupon authorized in an amount which will equal the sum of the return to investors and the company's operating expenses.

*Northwestern Bell Telephone Co. v. State,* 299 Minn. 1, 5–6, 216 N.W.2d 841, 846 (1974).

In considering these factors, the PSC must balance the interests of the utility against the interests of the utility's customers. *Minneapolis Street Railway Co. v. City of Minneapolis,* 251 Minn. 43, 72–73, 86 N.W.2d 657, 676 (1957). The United States Supreme Court established requirements for determining the rate of return in *Bluefield Waterworks and Improvement Co. v. Public Service Commission,* 262 U.S. 679, 43 U.S. 675, 67 L.Ed. 1176 (1923), and *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), which this court has followed. One constraint enunciated by the United States Supreme Court is that the PSC cannot fix rates that are unconstitutionally confiscatory.

Rates which are not sufficient to yield a reasonable return on the value of the property used, at the time it is being used to render the service, are unjust, unreasonable, and confiscatory, and their enforcement deprives the public utility company of its property in violation of the Fourteenth Amendment.

*Bluefield Waterworks and Improvement Co. v. Public Service Commission,* 262 U.S. at 690, 43 S.Ct. at 678.

The trial court noted that the PSC, in an attempt to standardize complex rate case procedures, has adopted a policy labeled the "*North Central* doctrine." *See In re Petition of North Central Public Service Co.,* No. G–101/GR–77–221 (Minn.Pub.Serv. Comm'n Dec. 30, 1977).

Fixing the rate of return on common equity is a legislative process. In the ideal sense the Commission's obligation is to insure that a Company has the opportunity to earn as much as it needs to maintain its financial integrity and provide adequate service and not a penny more. In exercising its mandate to protect the public interest, we believe that we should choose the lowest acceptable recommendation (adjusted as appropri-

ate) which falls within the range of reasonableness. We will first review the testimony of all the witnesses to determine a range of reasonableness. We will then focus on the testimony of the witness who recommends the lowest rate of return to determine if it is reasonable and has withstood the tests of cross examination and rebuttal testimony. If we are satisfied that it is sound, we will adopt it. If the testimony has been shown to be deficient in certain respects but is nevertheless basically sound, we will adjust it to remedy the deficiencies and adopt it as adjusted. If we conclude that the testimony is basically unsound, we will reject it and consider the next lowest recommendation, etc.

■ We note that this policy is no doubt designed to comply with the statutory requirement that the PSC ensure that utility rates are just and reasonable and that "[a]ny doubt as to the reasonableness should be resolved in favor of the consumer." Minn.Stat. § 216B.03 (1978). The *North Central* doctrine is, however, not an adequate method to achieve that goal. Chapter 216B gives to the PSC the duty as well as the power to set a just and reasonable rate after a full review of evidence and testimony. To peg an established rate to a rate advocated by any one of several expert witnesses is an arbitrary delegation of that duty. The use of the *North Central* doctrine is impermissible. Nonetheless, a review of the record satisfies us that the PSC did not apply the doctrine in this case, even though it announced that it was following the doctrine. Reversal on this ground is not required.

■ One central issue on appeal involves the PSC's determination of MPL's rate of return on common equity. A utility's rate of return is measured by computing the cost of debt, the cost of preferred stock, and the cost of common equity. Thus, an important factor in determining the overall rate of return is finding the appropriate rate of return on common equity.

■ The establishment of a fair return on common equity entails lengthy and complex hearings. However, we observe that the basic principles involved in this procedure are not complex. The property of the utility must be evaluated. From this figure there is subtracted the amount of borrowed capital and capital contributed by preferred stock. The difference represents the common equity of the shareholders. The rate of return on the shareholders' equity must be sufficient to attract reasonable prudent investors.

The trial court found there was not substantial evidence to support the PSC's determination that MPL's appropriate rate of return on common equity was 13 percent. The trial court adopted the hearing examiner's finding that the appropriate range for return on common equity is 13.25 percent to 14 percent with full capitalization of AFDC and remanded the matter for determination of the exact amount by the PSC.

■ To support its conclusion that 13 percent was an insufficient rate of return, the trial court took judicial notice of an MPL stock offering which occurred after the PSC hearing and order. This is inappropriate. Subsequent events should not be considered by a court in reviewing the appropriateness of a commission order. These events are appropriately to be considered by the PSC in a rate hearing occurring after such event.

■ The trial court based its conclusion on its evaluation of the experts' testimony. We note that PSC's failure to adequately state the facts it relies on in support of its determination of the rate of return complicates the reviewing court's role. An examination of the PSC's discussion of the growth factor, one component of the rate of return on common equity, highlights the problem a reviewing court encounters when the PSC fails to set forth the factual basis for its determination. The expert called by the PSC's staff testified that MPL's growth factor was within a 3.0 to a 3.5 percent range. MPL's expert indicated that the PSC's expert reached his conclusion based on an inconsistent analysis and that the proper growth factor, using the method

prescribed by the PSC's expert, was 4.8 percent. The PSC concluded that the two experts' recommendations were highly judgmental and merely established a range of reasonableness from which the PSC chose the figure 4.3 percent. Computation of the growth factor involves calculation of a weighted average. However, the PSC merely stated that it adopted the growth figure of 4.3 percent and failed to state the facts and figures the PSC used in calculating the growth figure. A reviewing court cannot intelligently pass judgment on the PSC's determination unless it knows the factual basis underlying the PSC's determination. Judicial deference to the agency's expertise is not a substitute for an analysis which enables the court to understand the PSC's ruling. Henceforth, we deem it necessary that the PSC set forth factual support for its conclusion. The PSC must state the facts it relies on with a reasonable degree of specificity to provide an adequate basis for judicial review. We do not require great detail but too little will not suffice.

We note that the growth factor of 4.3 percent is a component of the 13–percent rate of return the PSC established for MPL. If the PSC had adopted a growth factor of 4.8 percent, the rate of return on common equity would have increased from 13.0 to 13.5 percent. In light of this, we find it disturbing to review the 1976 MPL rate proceedings in which the PSC concluded that 13.25 percent was MPL's minimum rate of return on common equity. There is nothing in this record that indicates why the PSC's position in the 1976 proceedings was abandoned one year later.

We also note that the PSC sought to justify a 13–percent rate of return on common equity on the grounds that it would maintain MPL's A bond rating and MPL's pretax coverage including AFDC above 3.5 percent for the test year. This conclusion appears questionable since the hearing examiner had noted in this proceeding that MPL's bond rating had already been reduced to A–. Based on the record before the court, we are satisfied that the district

court was correct in holding that a rate of 13 percent was not supported by substantial evidence.

2. The trial court properly evaluated allocation of rates as a legislative function of the PSC. We affirm its decision that the record supports the PSC's rate allocation in accordance with the standards established in *St. Paul Area Chamber of Commerce v. Minnesota Public Service Commission*, 312 Minn. 250, 251 N.W.2d 350 (1977), and enunciated above.

However, we do caution the PSC that, in exercising its right to take judicial notice of facts, it must be amenable to consider evidence which attacks the truth of judicially noticed facts.

3. We agree with the trial court that the PSC properly rejected the allowance of construction costs of the Floodwood–Fine Lakes utility project and the Coyote generating plant as allowable rate case expenses.

Affirmed with modification.