## MINNESOTA POWER & LIGHT COMPANY, Respondent,

v.

## MINNESOTA PUBLIC UTILITIES COMMISSION, et al., Appellants.

### No. C4-82-1494.

Supreme Court of Minnesota.

Dec. 16, 1983.

Hubert H. Humphrey, III, Atty. Gen., Karl W. Sonneman, Sp. Asst. Atty. Gen., Kenneth A. Nickolai, Sp. Asst. Atty. Gen., St. Paul, for appellants.

Samuel L. Hanson, R. Scott Davies, Briggs & Morgan, James R. Habicht, Duluth, for respondent.

SCOTT, Justice.

This case comes before the court for a second time. *See Hibbing Taconite Co. v. Minnesota Public Service Commission,* 302 N.W.2d 5 (Minn.1980) (hereinafter *Hibbing Taconite*). On remand from that decision, the Minnesota Public Utilities Commission (PUC) issued an order reaffirming its original conclusion allowing Minnesota Power & Light Company (MPL) a return on common equity of 13 percent. MPL appealed from that order to the district court. The district court reversed and remanded the case for the PUC to establish MPL's return on common equity at a figure greater than 13 percent. The PUC and the Minnesota Department of Public Service

(intervenor) appeal to this court, seeking review of that decision. We reverse.

MPL commenced this action on April 5, 1977, when it filed a notice of rate change with the Minnesota Public Service Commission.[1] After extensive proceedings, the PUC concluded, in part, that MPL's return on common equity should be 13 percent. On appeal, the district court reversed that finding, ruling that it was not supported by substantial evidence. It remanded the case for the PUC to establish MPL's return on common equity within the range of 13.25 to 14 percent. The PUC appealed to this court from that decision. We affirmed the result of the district court with the modification that, on remand, the PUC was not required to establish MPL's return on common equity within the range of 13.25 to 14 percent. *Hibbing Taconite*, 302 N.W.2d at 9.

On remand, the PUC did not take any additional evidence. Rather, based on the record of the prior administrative hearings, the PUC issued an order reestablishing MPL's return on common equity at 13 percent. In accordance with its perception of the directives of *Hibbing Taconite*, the PUC set forth additional findings of fact and conclusions of law detailing both the evidence and reasoning in support of its decision to reaffirm its original conclusion.

Four witnesses gave testimony at the prior administrative hearings relevant to MPL's return on common equity. Arend J. Sandbulte, Russell Fraser and Zvi Benderly testified on behalf of MPL. Ralph Miller testified on behalf of the Department of Public Service. After summarizing the testimony of those witnesses, the PUC primarily focused on the testimony of Benderly and Miller because only they offered empirical support for their recommendations.[2] Due to several perceived deficiencies in

Benderly's statistical analysis, the PUC decided to rely on the discounted cash flow method (DCF) to determine MPL's return on common equity. It also concluded that Miller's DCF analysis could be accepted with certain adjustments. Miller first determined an average cost of common equity for 91 large electric utilities, including MPL. That sample purportedly included all the companies most comparable to MPL. He then derived MPL's cost of common equity by adjusting the average cost of equity for the 91 utilities to account for risks unique to MPL. The PUC rejected Benderly's criticism that the cost of equity among the utilities in that sample was too varied to accurately indicate MPL's cost of common equity. On that point it noted that "the range and pattern of debt costs for electric utilities is remarkably similar to the range and spread pattern of common equity costs for electric utilities as developed by Mr. Miller and very much narrower than that found by Mr. Benderly."

The PUC derived MPL's return on common equity by adding the following factors:

| | | |
|---|---|---|
| 1. | Current dividend yield | 8.0% |
| 2. | Expected growth rate | 4.3% |
| 3. | Risk factor posed by Square Butte Project | .2% |
| 4. | Adjustment for market pressure and cost of issuing new stock (8% X 6%)[3] | .48% |
| | | 12.98% |

It rounded off the sum of those factors to 13 percent.

The PUC based its finding as to current dividend yield on Miller's calculation that the average dividend yield for the 91 utilities was 8.03 percent. It then calculated a growth rate of 4.3 percent, based on the

1. In 1980, the Public Service Commission was renamed the Public Utilities Commission. *See* Act of April 24, 1980, Ch. 614, § 101, 1980 Minn. Laws 1436, '.495. The Public Service Commission will hereafter be referred to as the PUC.

2. Benderly recommended that MPL's request for an allowance of 15 percent was reasonable.

Miller recommended an allowance of 12 percent.

3. This adjustment factor (6 percent) is first multiplied by the current dividend yield (8 percent) before being added to the other three factors.

testimony of both Miller and Benderly.[4] Miller recommended a growth rate of 3.0–3.5 percent based on his analysis of certain growth factors of the 91 utilities; Benderly testified that Miller should have focused only on MPL and that the growth rate should have been 4.8 percent using Miller's analysis. The PUC established a growth rate between those recommendations, finding that an investor would look both to the historical growth of the company and to the growth of comparable electric utilities. Recognizing that investors would probably rely more heavily on the historical growth of MPL, it calculated the growth rate of 4.3 percent by giving Benderly's recommendation twice as much weight as that of Miller.

The PUC then added two adjustment factors. First, it found it appropriate to add an adjustment for the risk posed by the Square Butte financing arrangement[5] and it adopted Miller's proposed .2 percent adjustment, finding it reasonable. It also determined that an adjustment was required for market pressure and the cost of issuance of new stock. After analyzing Miller's and Benderly's recommendations, it adopted Miller's highest recommendation of 6 percent because it was reasonable and supported by empirical data; it considered Benderly's recommendation of 10 percent to be excessive and unsupported by empirical data.

Finally, the PUC explained why it lowered MPL's return on common equity in this proceeding from the 13.25 percent rate established in the 1976 rate proceedings. First, it acknowledged that it not only denied MPL's requested rate increase in that case, but it also reduced existing rates by 2.3 million dollars. In comparison, it granted 70 percent of MPL's requested rate increase in the instant proceeding. In addition, it found that the evidence of declining money costs supported an allowance of 13 percent.

MPL appealed to the district court, seeking review of the PUC's order after remand. The district court reversed and remanded the case to the PUC, holding that our opinion in *Hibbing Taconite* required the PUC to establish a return on common equity greater than 13 percent and that the order after remand was not supported by substantial evidence. Because the order after remand was based on the same evidence as the original order, the district court reasoned that "further explanation or rationalization of the PSC's finding cannot create 'substantial evidence.'" The district court also reiterated its prior position that the appropriate range for MPL's return on common equity should be 13.25 to 14 percent.

The following issues are thereby presented:

(1) Whether, upon remand for the lack of substantial evidence to support an agency's ruling, the standard may be met, without the submission of further evidence, by the agency's expert analysis of the record, setting forth explanations for its conclusions.

(2) If so, whether the agency's order after remand is now supported by substantial evidence.

■ 1. On appeal, the PUC seeks a ruling that its order allowing MPL a return of 13 percent is supported by substantial evidence. MPL claims that that very same issue was decided adversely to the PUC when the case first came before this court. It is well established that "issues considered and adjudicated on a first appeal become the law of the case and will not be reexamined or readjudicated on a second appeal of the same case." *Lange v. Nel-*

---

**4.** In finding an expected growth of 4.3 percent, the PUC noted that this court had criticized its failure to adequately explain how it derived that same value in the order which was the subject of the first appeal. It further noted that this factor is "highly subjective and not susceptible to a precise mathematical formula."

**5.** MPL entered into an agreement to purchase power from Square Butte Cooperative which is located in Center, North Dakota. The Square Butte project is unique due to its financing arrangement, termed "leverage lease financing." Sandbulte testified, "That means that the lessors or the people putting up the equity money are entitled to tax deductions whether it be liberalized depreciation or investment tax credit."

*son-Ryan Flight Service, Inc.,* 263 Minn. 152, 155, 116 N.W.2d 266, 269 (1962). While the parties agree on that point of law, each has a different interpretation of *Hibbing Taconite* as it relates to this appeal.

The PUC contends that in *Hibbing Taconite* we remanded for more specific findings on the issue of MPL's appropriate return on common equity, holding that we could not decide whether there existed substantial evidence to support the commission's conclusion because its findings of fact were inadequate. Although we discussed the difficulty of judicially reviewing that determination due to the PUC's failure "to adequately state the facts it relie[d] on in support of its determination,"[6] we concluded that, "[b]ased on the record before the court, we are satisfied that the district court was correct in holding that a rate of 13 percent was not supported by substantial evidence." *Hibbing Taconite,* 302 N.W.2d at 12. Relying on that sentence, MPL argues that this court necessarily ruled the evidence to be insufficient, as a matter of law, to support the PUC's determination. The PUC counters that the concluding sentence must be harmonized with this court's analysis. In effect, it argues that our conclusion was based on the inadequacy of the findings and not on the insufficiency of the evidence.

The key question presented is whether, by concluding that the PUC's determination was unsupported by substantial evidence, this court necessarily ruled that the evidence was insufficient to support that determination. This requires an analysis of the nature of the substantial evidence test. We have defined the "substantial evidence" test as a quantitative evidentiary test requiring "such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 825 (Minn. 1977); *see also In re Plum Grove Lake,* 297 N.W.2d 130, 135 (Minn.1980). Moreover, in the past, this court has analyzed the adequacy of the findings apart from the issue of whether there exists substantial evidence. For example, we stated that "a reviewing court [could not] possibly decide whether substantial evidence exist[ed] to support the [agency's] conclusions" where it was impossible to determine from the findings of fact whether the agency considered certain factors. *People for Environmental Enlightenment and Responsibility, Inc. v. Minnesota Environmental Quality Council,* 266 N.W.2d 858, 872 (Minn.1978); *see also Morey v. School Board of Independent School District No. 492,* 271 Minn. 445, 448–50, 136 N.W.2d 105, 107–08 (1965). In *People for Environmental Enlightenment and Responsibility,* 266 N.W.2d at 872, we stated that the proper disposition would generally be to remand for more specific findings when the findings are inadequate to permit review. *See also Minneapolis Street Railway Co. v. City of Minneapolis,* 251 Minn. 43, 61, 86 N.W.2d 657, 669–70 (1957).

Although we stressed in *Hibbing Taconite* that adequate agency factfinding is essential for meaningful judicial review, this court never expressly concluded that review was impossible in that case nor did we expressly remand that case for more specific findings. Rather, we went on to affirm the district court's holding that the PUC's conclusion was not supported by substantial evidence. If the substantial evidence test is viewed solely as being directed at the quantity of evidentiary support for the agency's decision, then *Hibbing Taconite* would have precluded the PUC

---

**6.** *Hibbing Taconite,* 302 N.W.2d at 11. After focusing on the difficulty of reviewing the PUC's conclusory finding as to the growth factor, one component of the DCF, we stated:

> A reviewing court cannot intelligently pass judgment on the PSC's determination unless it knows the factual basis underlying the PSC's determination. Judicial deference to the agency's expertise is not a substitute for an analysis which enables the court to understand the PSC's ruling. Henceforth, we deem it necessary that the PSC set forth factual support for its conclusion. The PSC must state the facts it relies on with a reasonable degree of specificity to provide an adequate basis for judicial review. We do not require great detail but too little will not suffice. *Id.* at 12.

from reestablishing a return of 13 percent based on the same evidentiary record.

Other courts, however, have stated that the " 'substantial evidence' test is not directed solely at the quantity of evidentiary support for an administrative determination." *Washington Public Interest Organization v. Public Service Commission*, 393 A.2d 71, 77 (D.C.1978), *cert. denied sub nom., Potomac Electric Power Co. v. Public Service Commission*, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979); *see also Industrial Union Department, AFL–CIO v. Hodgson*, 499 F.2d 467, 475–76 (D.C.Cir. 1974) (substantial evidence test applied to informal rule making). Those courts view the substantial evidence test as also requiring an agency to explain its methodology or reasoning when support for its conclusion is not readily discernible on the evidentiary record, such as when the agency must make a judgment call. *Industrial Union*, 499 F.2d at 475–76; *Citizens Association of Georgetown, Inc. v. District of Columbia Zoning Commission*, 402 A.2d 36, 44 n. 13 (D.C.1979); *Washington Public Interest Organization*, 393 A.2d at 77–78. In *Washington Public Interest Organization*, 393 A.2d at 93, the court expressly declared that it was not ruling on the evidentiary merits by holding that the commission's order was unsupported by substantial evidence. Rather, the court said that a reversal and remand was necessary for the commission to reconsider and explain its decision. *See also American Federation of Labor & Congress of Industrial Organizations v. Marshall*, 617 F.2d 636, 670–72, 677 (D.C.Cir.1979); *Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission*, 407 Pa. Commw. 512, 409 A.2d 446 (1979).

 We hold that the latter view of the substantial evidence test is consonant with our *Hibbing Taconite* decision. In *Hibbing Taconite*, we questioned certain findings by the PUC. In particular, we could neither find evidentiary support for the PUC's finding on growth rate nor could we discern how the PUC derived that finding. *Hibbing Taconite*, 302 N.W.2d at 11–12. This court was also troubled because the record failed to indicate why the PUC reduced MPL's return on common equity from 13.25 percent in 1976 to 13 percent in 1977 when it had concluded in 1976 that 13.25 was MPL's minimum return. *Id.* at 12. We did not address the evidentiary merits. Rather, our analysis raised questions requiring explanations that only the expert agency could offer. Lacking explanations, we could not uphold the PUC's decision as being supported by substantial evidence. We understand the trial court's confusion, but hold that it erred when it ruled that further explanation or rationalization could not fulfill the substantial evidence test, and also erred in holding that *Hibbing Taconite* precluded the PUC from allowing a return of common equity of 13 percent.[7]

 2. The district court held that the PUC's order was unsupported by substantial evidence. This court, however, independently reviews the agency's decision without according any special deference to the district court's review. *Reserve Mining Co.*, 256 N.W.2d at 824. Furthermore, because of an agency's expertise, its order is presumptively valid and the reviewing court should show deference to conclusions involving its expertise. *Id.* On appeal, MPL challenges the PUC's order, claiming that its findings on growth rate, the risk differential, and the adjustment for market pressure and cost of issuance are all unsupported by substantial evidence. It also challenges the PUC's explanation as to why it reduced MPL's return from 13.25 percent in 1976 to 13 percent in the instant proceeding.

(a) *Growth rate.*

 When this case first came before us, we criticized the PUC for adopting a growth rate between the recommendations

---

**7.** In the *Hibbing Taconite* decision we said: "Although we affirm the result reached by the trial court, its findings as to the appropriate range for MPL's rate of return on common equity is not binding on the PSC on remand." 302 N.W.2d at 9.

of Miller and Benderly without explaining how it derived that finding. *Hibbing Taconite,* 302 N.W.2d at 12. On remand, the PUC found the same growth rate, but this time explained how it arrived at its conclusion. It is difficult to review that finding under the traditional substantial evidence standard because it is not susceptible to precise verification on the evidentiary record due to its judgmental nature. Two commentators have stated:

> Determination of growth rate necessarily involves predictions, assumptions and judgments. No matter how many hard data are available in the form of historical trends, market conditions or the status of the utility as a mature versus expanding enterprise, the ultimate decision of the commission is necessarily based on agency judgment and expertise.

Hamilton & Colacci, *Judicial Review of Utility Ratemaking in Minnesota: An Analysis and a Proposal,* 8 Wm. Mitchell L.Rev. 543, 556–57 (1982) (footnote omitted). Thus, when applying the substantial evidence test to that type of finding, the reviewing court should determine whether the agency has adequately explained how it derived its conclusion and whether that conclusion is reasonable on the basis of the record. *See Washington Public Interest Organization,* 393 A.2d at 77–78; *see also Texas Independent Ginners Association v. Marshall,* 630 F.2d 398, 405 (5th Cir. 1980); *Industrial Union,* 499 F.2d at 473–76; Hamilton & Colacci, *supra,* at 557, 561–62.

The PUC derived its finding by taking a weighted average of the recommendations of Miller and Benderly. It did so because Miller's recommendation was based on the average growth rate for a sample of 91 utilities, while Benderly, using Miller's analysis, recommended a growth rate based only on MPL data. The PUC was impressed by Miller's testimony that investors would not look solely to the historical growth rate of MPL, but would also look to the growth of related companies. Yet, it also recognized that investors would probably weigh the historical growth rate of MPL more heavily. It therefore established its finding of 4.3 percent by giving Benderly's recommendation twice as much weight.

MPL argues that the PUC's method was unreasonable because investors would know that MPL was selling stock to finance a large plant expansion program. It therefore concludes that investors would not evaluate its position in light of other utilities and thus the commission should have found a growth rate of 4.8 percent in accordance with Benderly's recommendation. We disagree. The PUC adequately explained its conclusion and that conclusion is reasonable on the basis of this record.

### (b) *Cost of issuance and market pressure.*

The PUC accepted Miller's highest recommendation of 6 percent on these factors because of his numerous empirical studies. MPL argues that the PUC's reliance on Miller was unjustified because he made no independent studies and some of the studies on which he relied were questionable. It contends that the PUC should have accepted Benderly's recommendation of 10 percent.

We see little merit in MPL's challenge to Miller's cost of issuance recommendation. However, the challenge to Miller's market pressure recommendation is more serious. Miller recommended a market pressure of 0–3 percent, based on a scholarly article and his own studies using data prepared by a large brokerage firm. As MPL points out, cross-examination of Miller tended to show that the scholarly article did not analyze transactions comparable to those at issue. Miller seemingly conceded the point by stating, "That's the one on which I partially base my conclusion because I said there are other bases."

As to his other basis, Miller admitted that Eugene Meyer, an employee of the brokerage firm compiling the data, calculated a market pressure of 0–15 percent, using that same data. However, Miller explained that the results differed because of their differing interpretations of the

data. He claimed that Meyer's interpretation had an upward bias. Moreover, Miller testified how he used the data to calculate market pressure and there is nothing in the record showing that Miller's use of the data was inherently wrong. We cannot substitute our judgment for that of the commission. *Reserve Mining Co.*, 256 N.W.2d at 825. Thus, we find no error here.

(c) *Risk adjustment for the Square Butte Project (Square Butte).*

MPL argues that the PUC erred by allowing only a .2 percent risk differential in accordance with Miller's recommendation. As MPL points out, Miller admitted he "[e]ssentially * * * picked a number." Miller went on to testify, however, that there was no mechanical formula to accurately assess Square Butte. In his opinion, he recommended a sufficiently large adjustment. Benderly also testified that his statistical model would not account for Square Butte and he made no recommendation.

MPL argues that Miller should have used the formula for calculating supplemental coverage for SEC reporting purposes, which would have resulted in a further adjustment of .3 percent. Miller, however, testified that that formula would not accurately assess Square Butte because it was for full debt supplemental coverage and Square Butte was not considered full debt equivalent. Also, Sandbulte testified that Square Butte was not considered full debt equivalent by Standard & Poor, a rating agency. Furthermore, contrary to MPL's contention, the SEC formula would add only approximately .1 percent to Miller's recommendation. On this record, we conclude that the PUC was warranted in adopting Miller's recommendation.

(d) *Comparison of 1976 and the instant proceeding.*

In *Hibbing Taconite*, this court was troubled because the record failed to indicate why the PUC reduced MPL's return on common equity from 13.25 percent in 1976

to 13 percent in this proceeding when it had stated in 1976 that MPL's minimum was 13.25 percent. *Hibbing Taconite*, 302 N.W.2d at 12. On remand, the PUC offered two explanations. First, it pointed out that, in 1976, it had totally denied MPL's requested rate increase and also reduced existing rates by 2.3 million dollars, while in this proceeding it granted MPL 70 percent of its requested rate increase. Second, it found that the evidence "of declining money cost" supported the lower return on common equity. MPL challenges the adequacy of these explanations.

MPL does not squarely address the PUC's first point. Rather, MPL primarily argues that a comparison of the 1976 record with the instant record compels the conclusion that, if anything, the return on common equity had to be greater in this proceeding. It generally claims that all its financial indicators had deteriorated under the 13.25 percent allowance and therefore it was "clear that something more * * * was needed." The 1976 record is not now before us. In the past, we have rejected arguments by MPL which called for an evidentiary comparison of the case before us with a prior proceeding not then before us, *see Minnesota Power & Light Co. v. Minnesota Public Service Commission*, 310 N.W.2d 686, 690 n. 7 (Minn.1981); we are similarly unpersuaded by the instant argument. Moreover, we conclude that MPL has failed to show that the PUC's explanation is unreasonable.

As to the second point, MPL argues that the PUC's conclusion is not supported by the record. The following, however, supports the PUC's reasoning. Benderly testified that interest rates were "somewhat" lower in the first half of 1977 than the 1976 average, but they were rising at the end of July. Yet, even in light of the rise, they still remained "30 basis points lower than the average for 1976." Miller testified that the cost of money had declined during much of 1975 and all through 1976. He saw no clear trend in 1977; money costs rose in the first few months, but fell back

during the summer. In addition to Miller's testimony that the cost of money is important to the cost of equity, Benderly gave testimony indicating that a rise in the cost of money increased the cost of equity. In light of the testimony showing a relationship between the cost of money and the cost of equity, the PUC's second explanation is supported by the record.

### (e) *Other claims.*

Finally, MPL makes two other arguments. It argues that the PUC misapplied the substantial evidence test by ignoring the testimony of Sandbulte and Fraser. Both witnesses essentially testified that MPL needed an allowance of at least 15 percent to maintain its present coverage and consequent A bond rating, particularly in light of the Square Butte project. Fraser further testified that MPL's credit rating was in danger because its preferred stock rating had fallen from A to A- in August 1976.

 As an initial matter, the substantial evidence test is a standard of judicial review. It requires the reviewing court to evaluate the evidence relied on by the factfinder "in view of the entire record as submitted." Minn.Stat. § 14.69(e) (1982). On the basis of this record, we conclude that the PUC was warranted in focusing primarily on Benderly and Miller. Furthermore, it did not ignore the other witnesses entirely. First, it took the Square Butte risk into account. Second, it added an adjustment for cost of issuance and market pressure because MPL would be offering common stock "in the foreseeable future."

Finally, MPL contends that the PUC unjustifiably rejected Benderly's recommendation. MPL's attempts to rebut the PUC's criticism of Benderly's analytical approach do not add anything to its attack on the PUC's order. The analytical approach to be used in calculating a return on common equity is a matter for the agency's expertise.

In conclusion, we are now satisfied that the PUC's order is supported by substantial evidence.

Reversed.