**In the Matter of the Petition of NORTH-ERN STATES POWER COMPANY for Authority to Change its Schedule of Rates for Electric Utility Service for Customers Within the State of Minnesota.**

No. C7–86–1482.

Court of Appeals of Minnesota.

March 10, 1987.

Review Granted May 18, 1987.

Glenn E. Purdue, William P. Jordan, Le-Fevere, Lefler, Kennedy, O'Brien & Drawz, Minneapolis, for intervenor Suburban Rate Authority.

Karl Sonneman, Alan Giles, Spec. Asst. Attys. Gen., St. Paul, for respondent Minnesota Public Utilities Comm.

Samuel L. Hanson, John B. Van de North, Jr., Briggs and Morgan, St. Paul, Gene R. Sommers, David A. Lawrence, David M. Sparby, Northern States Power Co., Minneapolis, for Relator Northern States Power Co.

Craig R. Anderson, Asst. Atty. Gen., St. Paul, for Dept. of Public Service.

Dennis D. Ahlers, Asst. Atty. Gen., St. Paul, for Hubert H. Humphrey III, State Atty. Gen.

Heard, considered, and decided by RANDALL, P.J., and FOLEY and WOZNIAK, JJ.

## OPINION

WOZNIAK, Judge.

Northern States Power Company (NSP) appeals from a decision of the Minnesota Public Utilities Commission (PUC or Commission) in an electric rate case. NSP contends (1) the PUC erred in not applying the "preponderance of the evidence" standard in this proceeding, but instead requiring the utility to prove its rate request by clear and convincing evidence; and (2) the agency's decision is not supported by substantial evidence. We affirm in part, reverse in part and remand.

### FACTS

Northern States Power Company (NSP) is a Minnesota corporation which provides gas and electric service. It generates, transmits, and distributes electricity throughout a 400,000 square mile service area which includes parts of Minnesota, Wisconsin, North Dakota, and South Dakota. NSP's principal Minnesota service area consists of the southern one-third of the state, including the Twin Cities metropolitan area. Only Minnesota electric service operations are involved in this case.

On August 1, 1985, NSP filed a petition with the PUC to increase its electric rates for service within Minnesota by $128,933,-000. NSP subsequently reduced the request to $121,676,000. The PUC accepted the filing, suspended rates, and ordered a contested case hearing on the NSP application.

Following extensive hearings in January and February 1986, the administrative law judge (ALJ) issued an order recommending an electric rate increase of $73,839,415. The ALJ report was released in two parts, one dealing with revenue and rate of return issues and the other addressing rate design. The Commission entertained exceptions, replies, and oral arguments upon the ALJ report before its June 2, 1986 order authorizing an electric rate increase of $36,951,000.

The PUC affirmed its decision and issued supplemental findings and conclusions on August 6, 1986, following NSP's request for reconsideration. NSP appealed on September 4, 1986 and sought accelerated review by the Minnesota Supreme Court, which was denied.

NSP now argues that the Commission's decision should be reversed and remanded for redeliberation. It claims the Commission erred by applying a standard of proof other than the preponderance of the evidence standard. Appellant also claims the Commission's findings regarding five revenue issues are unsupported by substantial evidence. These issues follow.

1. *Return on common equity.* The return on common equity is the earnings allowed NSP shareholders on their investments. A number of expert witnesses testified that the allowable rate of return on common equity should range from 12% to 15%. The ALJ recommended the appropriate rate of return on equity was 13.66% as calculated by Dr. Matitejohn Marcus, the witness for the attorney general. The Commission actually allowed a 12.81% return on equity, a figure not recommended by any party to the proceeding.

2. *Capital Structure.* NSP proposed a capital structure consisting of 43.39% long-term debt, 2.19% short-term debt, 8.43% preferred stock, and 45.99% common equity. The ALJ recommended adoption of NSP's capital structure proposal to calculate the rate of return and found no competent evidence in the record to show that NSP's proposal was unreasonable.

Luther Thompson, testifying for the State Department of Public Service (DPS), claimed the company's capital structure was reasonable, although at the upper end of the scale. He based his opinion on comparisons with other comparable companies. Marcus, testifying for the attorney general's office, also adopted NSP's proposed capital structure.

Kenneth Zapp, Metropolitan Senior Federation witness, opposed NSP's figures, arguing that the company's high equity ratio placed an unnecessary burden on consumers while reducing the risk for NSP shareholders. The Commission rejected the ALJ's findings and determined NSP did not support its capital structure proposal with sufficient evidence as to its reasonableness. In its August 6, 1986 order, the PUC found:

The excessive equity ratio proposed by NSP for ratemaking purposes places an unreasonable burden on NSP's ratepayers through an unnecessarily high overall cost of capital. The Commission agrees with Dr. Zapp that if NSP management chooses to maintain a higher than needed equity ratio, then the shareholders, not NSP's customers, should pay the increased cost of capital.

The Commission rejected Zapp's 42.5% equity ratio, adopted a 45% equity ratio balance, and transferred the difference to long-term debt. This figure is important because stockholders are entitled to a return on equity, but not on debt. Therefore, the greater a company's debt component, the smaller the equity component, which results in a lower rate paid by the utility's customers to the stockholders.

The parties' capital structure proposals were:

| Component | NSP | Commission (hypothetical) | |
|---|---|---|---|
| Long-term debt | 43.39% | 43.39% | |
| Capital structure adjustment | | .99% | |
| Short-term debt | 2.19% | 2.19% | |
| Preferred Stock | 8.43% | 8.43% | |
| Common Stock (equity) | 45.99% | 45.00% | |
| TOTAL | 100.00% | 100.00% | |

3. *Delay in payments.* The focus of this issue is the delay in recovery of investor-supplied capital from customers after the time a depreciable asset was acquired or constructed. NSP requested an adjustment in the rate base to reflect the approximately 43–day delay between the time the rate base is reduced and cash is received. The ALJ recommended that the PUC deny NSP's proposal. The Commission adopted the ALJ's findings and relied on its past decisions to deny the proposal. The Commission stated, "Nothing in the record of this proceeding warrants a reversal of those conclusions."

4. *Allocation factors.* Since NSP provides electric service in North and South Dakota and Minnesota using an integrated system of generation and transmission facilities, the PUC must allocate the entire rate base, expenses, and revenue among those jurisdictions before setting rates for

Minnesota customers. One of the factors used is the demand cost allocation factor, which is used to allocate all fixed costs associated with generating and transmitting facilities.

In previous Minnesota general electric rate cases, NSP allocated fixed costs using a method labeled "summer-winter" which the PUC approved. Both North and South Dakota have also approved this method for setting rates. In this case, NSP proposed to change to a different method called an "Average 12 Month Coincident Peak" (or 12CP).

The Commission found this change in calculation method would allocate more fixed costs to Minnesota and increase the revenue required from Minnesota customers. The ALJ recommended use of the summer-winter method. The PUC accepted the ALJ recommendation and found that:

> [A] company providing service in more than one jurisdiction should use a consistent allocation method to distribute costs among the jurisdictions to avoid over- or under-recovery of the Company's revenue requirements.

The PUC also noted that neither North nor South Dakota had proposed or adopted the 12CP allocation method.

5. *Conservation Cost Recovery.* NSP is required to operate gas and electric conservation projects under Minn.Stat. § 216B.241 (1984). Pursuant to this statute, the PUC ordered NSP to implement public utility conservation improvement programs (PUCIP), conservation improvement programs, and utility renewable resource pilot programs (URRPP).

When the Commission approved NSP's PUCIP projects, it permitted the company to account for the project expenditures in a deferred debit account and to collect a carrying charge on the deferred balance. The Commission also approved deferred debit accounting for CIP and URRPP programs. In this rate case, NSP proposes a carrying charge for the deferred debit account for the CIP and URRPP expenses.

The Commission authorized NSP to recover deferred conservation costs over a one-year period, coinciding with interim rate collections. It allowed carrying charges on deferred costs until the beginning of that year, but denied NSP's request for carrying charges during the recovery year. The Commission adopted the ALJ's finding that recovery was inappropriate because the deferred debit accounts represent "extraordinary ratemaking" and are a temporary expedient, to be eliminated as soon as the cost can be built into the rates.

## ISSUES

1. Did the Commission err by not applying a "preponderance of the evidence" standard of proof in this proceeding, instead requiring NSP to prove its rate request by clear and convincing evidence?

2. Is the agency's decision unsupported by substantial evidence or arbitrary and capricious?

## ANALYSIS

### I.

A. Quantum of Proof

1. *Scope of Review*

An appellate court is not bound by an agency's determination on a question of statutory interpretation. Since the proper standard of proof is a question of law, this court does not need to defer to the PUC's determination. *See Arvig Telephone Co. v. Northwestern Bell Telephone Co.,* 270 N.W.2d 111, 114 (Minn.1978). However, in *Arvig* the court noted that agency construction of a statute may be given some weight where:

(1) the statutory language is technical in nature, and

(2) the agency's interpretation is one of long-standing application.

*Id.* (citations omitted).

2. *Minn.Stat. § 216B.03 (1984) and Minn. Rule 1400.7300, subpt. 5.*

The issue here is interpretation of Minn. Stat. § 216B.03 and whether its language

changes the burden of proof standard found in Minn. Rule 1400.7300, subpt. 5.

Minnesota Rule 1400.7300, subpt. 5, applicable to contested case hearings, adopts the preponderance of the evidence standard.

> Subpt. 5 **Burden of Proof.** The party proposing that certain action be taken must prove the facts at issue by a preponderance of the evidence, unless the substantive law provides a different burden or standard.

*Id.*

Minnesota Statutes Section 216B.16, subdivision 4 (1984) provides:

> Subd. 4. **Burden of Proof.** The burden of proof to show that the rate change is just and reasonable shall be upon the public utility seeking the change.

*Id.* This section does not specify the quantum of proof necessary to establish the reasonableness of the proposed rates.

Minnesota Statutes Section 216B.03, requiring that utility rates be reasonable, states that "[a]ny doubt as to reasonableness should be resolved in favor of the consumer."

NSP contends the Commission's task of setting a fair and reasonable rate requires findings of fact based upon a "fair preponderance of the evidence." The agency's finding is then subject to appellate review to determine (1) if it satisfies the substantial evidence test, and (2) if the rates satisfy the constitutional prohibition against confiscatory rates.

NSP charges the PUC applied a more stringent standard of proof, which approached the "clear and convincing" standard. It argues that application of this standard is an error of law requiring full Commission redeliberation on all revenue issues.

The ALJ addressed the burden of proof issue in his report, stating:

> 34. The quantum of proof necessary to establish the reasonableness of the proposed rate change is proof by a preponderance of the evidence.

Minnesota Rules 1400.7300, subpt. 5 (1985).

This court held in *In re Minnesota Public Utilities Commission,* 365 N.W.2d 341, 343 (Minn.Ct.App.1985), *pet. for rev. denied* (Minn. May 31, 1985), that the burden of proof for a telephone company seeking to change its rates is set forth in Minn.R. 1400.7300, subpt. 5. However, the PUC points out that there is no language similar to the "any doubt" language of Minn.Stat. § 216B.03, which is contained in Minn.Stat. ch. 237 regulating telephone rates. Further, the Commission urges this court to impose a "clear and convincing" standard of proof for gas and electric utility rate cases. Alternatively, the PUC claims this court should not address the standard of proof issue because the standard of proof was not critical to the outcome of this case.

■ We agree with the Commission that the standard of proof employed was not critical to the outcome. We find, however, that the appropriate quantum of proof needed to establish the reasonableness of a proposed rate change is the same as in any other civil case—a fair preponderance of the evidence. *See Trimbo v. Minnesota Valley Natural Gas Co.,* 260 Minn. 386, 398, 110 N.W.2d 168, 176 (1961); *cf. Carpenter v. Nelson,* 257 Minn. 424, 427, 101 N.W.2d 918, 921 (1960) (degree of proof required in civil actions generally).

## II.

### A. Revenue Issues

#### 1. *Standard of Review*

NSP argues the Commission's findings concerning five revenue issues are not supported by substantial evidence. The Administrative Procedures Act (APA), Minn. Stat. § 14.63–.69 (1986), governs appellate review of an administrative agency decision. On appeal, this court may reverse the agency's decision if unsupported by substantial evidence of record or if we find the decision is arbitrary and capricious or affected by other errors of law. *Id.* § 14.69.

Substantial evidence is defined as:

1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion;

2) more than a scintilla of evidence;

3) more than "some evidence";

4) more than "any evidence"; and

5) evidence considered in its entirety.

*Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 825 (Minn.1977). The supreme court has also directed that if the agency engaged in reasoned decision making, the court should affirm "even [though] it might have reached a different conclusion had it been the factfinder." *Id.* Courts are also expected to accord the agency's decision a presumption of correctness. *City of Moorhead v. Minnesota Public Utilities Commission,* 343 N.W.2d 843, 846 (Minn.1984).

An agency action is arbitrary and capricious if its determination represents its will and not its judgment. *Markwardt v. State, Water Resources Board,* 254 N.W.2d 371, 374 (Minn.1977).

### 2. *Capital Structure*

The Commission rejected NSP's projected capital structure, which was supported by all parties except one and recommended by the ALJ. Instead, the Commission adopted an alternative hypothetical structure. At issue is the cost of equity figure. NSP recommended 45.99%. The PUC adopted 45%. The Commission determined that 45.99% was unreasonably burdensome to ratepayers and unsupported by evidence in the record.

Capital structure is one component used in determining overall rate of return by weighing the cost of capital by its percentage in the company's capital structure—how company obtained the funds (debt, equity or preferred stock). The more debt a company has, the less security for investors. Therefore, the PUC argues it must balance the safety for investors and economy for ratepayers.

The ALJ found that use of NSP's actual capital structure is appropriate. The Commission found that "NSP has not come

forward with sufficient evidence to justify the reasonableness of its capital structure for ratemaking purposes." It noted that its previous orders expressed concern for the dramatic increase in the equity component of capital structure and concluded a higher equity ratio was not justified in this case as it was in the preceding gas rate case. The ALJ concluded the evidence supported the reasonableness of the structure, which was within the normal range for comparable utilities in previous rate cases.

In *Northwestern Bell Telephone Co. v. State,* 299 Minn. 1, 216 N.W.2d 841 (1974), the supreme court approved the Commission's use of the utility's actual capital structure. There, the court stated:

> We have difficulty accepting the concept that in a rate case of this kind the state may collaterally attack the judgment of the company in maintaining its embedded debt at a low figure. We agree with the position of the company that this is a discretionary matter of management which, in the light of soaring interest rates, seems to vindicate the company's decision to keep its debt obligations to a minimum.

*Id.* at 14–15, 216 N.W.2d at 850.

In *Peoples Natural Gas Co. v. Minnesota Public Utilities Commission,* 342 N.W.2d 348 (Minn.Ct.App.1983), this court held *Northwestern Bell* applies to utilities that have an objective capital structure of their own. *Id.* at 352. The Commission should not have rejected the company's actual capital structure, especially since the record shows it to be within the normal range for comparable utilities.

 The Commission did not explain how it arrived at the 45% equity ratio figure. The Commission stated in its order, "Therefore the Commission will use a hypothetical equity ratio of 45% for ratemaking purposes in this proceeding. Use of a 45% equity ratio balances the interests of ratepayers with fairness to NSP."

The PUC does not adequately explain how it devised the 45% figure. In *Hibbing Taconite Co. v. Minnesota Public Service*

*Commission,* 302 N.W.2d 5 (Minn.1980), the supreme court could not discern how the Public Service Commission arrived at a particular finding and instructed agencies to thereafter state facts relied upon with a reasonable degree of specificity to provide a basis for judicial review. *Id.* at 12. Therefore, lacking adequate explanation, we cannot find the PUC's decision is supported by substantial evidence.

### 3. *Return on Common Equity*

A utility is authorized to earn a fixed percentage on investments on its rate base within the state. To set the percentage, the Commission first determines a capital structure—the company's cost of debt, i.e., preferred stock. The ALJ determined the rate of return on common equity should be 13.66% after considering testimony from five expert witnesses, each using the same discounted cash flow (DCF) analysis.

NSP witness Paul Pender recommended a 15% rate of return after analyzing a group of comparable utilities. The ALJ rejected Pender's figure because he "did not offer any evidence or analysis not considered and rejected" by the ALJ and PUC at the last rate hearing.

Marcus, the attorney general's representative, concluded the required return on equity should be 13.66%. He also analyzed a comparison group. DPS witness Luther Thompson recommended a 13.45% return of equity. However, unlike Marcus, he did not adjust his calculations to reflect a higher first-year dividend.

Suburban Rate Authority witness Derrick Dahlen recommended that the PUC apply the Federal Energy Regulatory Commission (FERC) rate of 13.86% for November 1, 1985 through January 31, 1986. Metropolitan Senior Federation witness Zapp recommended a 12% rate of return on equity. The ALJ adopted Marcus' recommendation and submitted a detailed report of his reasons.

In rejecting the ALJ's recommendation and the figures proposed by other witnesses, the Commission indicated that it relied on testimony of expert witnesses and used figures supplied by DPS witness Thompson to calculate the 7.18% dividend yield. The Commission noted it used data collected over a one-year period to "smooth volatility," selecting more recent periods for current data.

[T]he commission applied its expert judgment to the analysis presented by these witnesses and has reached different conclusions.

Appellant charges the Commission improperly relied on data from outside the hearing record. The PUC admits to taking administrative notice of posthearing stock prices and the FERC rate of return. However, the Commission claims its determination of return on equity was based solely on record data, and it took notice of the stock quotes and FERC figures merely to confirm its conclusions. In addition, the PUC claims it satisfied the proper notification procedures before it took administrative notice.

Minnesota Statutes Section 14.60, subdivision 4 (1984) provides for consideration of posthearing data.

**Subd. 4. Official notice.** Agencies may take notice of judicially cognizable facts and in addition may take notice of general, technical, or scientific facts within their specialized knowledge. Parties shall be notified in writing either before or during hearing, or by reference in preliminary reports or otherwise, or by oral statement in the record, of the material so noticed, and they shall be afforded an opportunity to contest the facts so noticed. Agencies may utilize their experience, technical competence, and specialized knowledge in the evaluation of the evidence in the hearing record.

*Id.*

In *Hibbing Taconite,* 302 N.W.2d at 11, the supreme court cautioned that a reviewing court may not consider subsequent events in reviewing the appropriateness of a Commission order. "These events are appropriately to be considered by the PSC in a rate hearing *occurring after such event.*" *Id.* (emphasis added). In this

case, the rate hearing took place *prior* to occurrence of the administratively noticed data.

On the other hand, the PUC argues it based its conclusion on its own evaluation of the experts' testimony. However, a review of the Commission's discussion of the components of the rate of return figures shows it did rely on "current data."

■ Although it is unclear whether the Commission considered posthearing evidence, the PUC clearly stated the facts and figures it used in calculating the growth figure. It did provide factual support for its conclusion and the 12.81% rate of return is supported by substantial evidence. However, since we hold the determination on the equity component of the company's capital structure was improper, this figure will change after revision.

### 4., 5. and 6. *Delay in Payments, Allocation Factors and Conservation Cost Recovery*

NSP argues the Commission's determinations on these three issues are not supported by substantial evidence. On all three issues, the Commission adopted the ALJ's recommendation.

■ The decision on the summer-winter allocation method is based on past decisions and the recommendation of the attorney general's representative that a change of method in Minnesota, but not in North and South Dakota, would permit over-recovery from Minnesota ratepayers. The Commission concluded a consistent allocation of costs between jurisdictions is important to insure consistency and fairness to Minnesota consumers.

We disagree with NSP's argument that the Commission improperly based its denial of the allocation factor change on the company's action in another state, where the Minnesota PUC has no jurisdiction. There is no question that NSP operates in three states and that costs must be fairly allocated. As the Commission correctly argues, its major concern here was not any problem with the 12CP allocation factor, but

consistent application of whatever factor is chosen.

■ NSP's proposal on the delay in payments issue would result in a $23 million increase in the rate base. This delay results from a 43-day lag between the spending of investor-supplied cash on a depreciable asset and the recovery for customers after depreciation is recorded. NSP argues that denying recovery during this 43-day period denies it a *full return* on investor-supplied capital.

Minnesota Statutes Section 216B.16(6), however, guarantees the utility a *reasonable return* on the rate base. Full return and reasonable return are not synonymous. Further, the PUC is entitled to deduct appropriate depreciation from the rate base. *Id.*

■ NSP also argues it should be permitted to earn a return on deferred conservation expenses. The Commission permitted NSP to use deferred debit accounting for the costs and assess a carrying charge to this account. (Deferred debit accounting permits recovery of these costs in the future.) The issue is whether the amounts associated with past conservation expenditures should be built into rates and *remain* there until NSP's next general rate proceeding or whether they should be subject to immediate amortization and be eliminated from the rates when amortized.

The ALJ recommended dropping the portion of the rate when the cost has been fully amortized and concluded that it is inappropriate for NSP to assess carrying charges during the amortization period because deferred debit accounts represent "extraordinary ratemaking" and are a "temporary expedient to be eliminated as soon as the cost included in it can be built into the rates."

The PUC agreed with the ALJ's determination that the amount recovered should include a carrying charge up to the beginning of the amortization period. The Commission argues that a rate-payer should not be required to pay a return on the money in the year in which it pays the expenses and

that the carrying charge is adequate compensation for NSP. When the Commission has struck a balance between the interest of the ratepayer and the competing interest of the shareholder, its decision should be affirmed if reasoned and not arbitrary. *See Northwestern Bell Telephone Co. v. State,* 253 N.W.2d 815, 822 (Minn.1977). That is exactly what the Commission has done and we will affirm.

Determinations, such as those on allocation factors, delay in payment and conservation cost recovery, require not only factual determinations but the recognition and balancing of competing interests.

Thus, when applying the substantial evidence test to that type of finding, the reviewing court should determine whether the agency has adequately explained how it derived its conclusion and whether that conclusion is reasonable on the basis of the record.

*Minnesota Power & Light Co. v. Minnesota Public Utilities Commission,* 342 N.W.2d 324, 330 (Minn.1983). The PUC adequately explained its conclusion, which is reasonable based on this record.

### DECISION

Where NSP's cost of equity, calculated from its actual capital structure, is within the normal range for comparable utilities, the PUC may not substitute a hypothetical equity figure without sufficient evidence. Therefore, we reverse on the cost of equity issue and remand for recalculation of the rate of return using the 45.99% cost of equity figure. We affirm on all other issues.

Affirmed in part, reversed in part and remanded.