In the Matter of the Petition of MINNESOTA POWER COMPANY for Authority to Establish a Short Term Large Power Rate Schedule and of an Investigation into the Reasonableness of the Large Power Demand Ratchet.

**M.A. HANNA COMPANY, Relator,**

v.

**MINNESOTA PUBLIC UTILITIES COMMISSION, Minnesota Power, Respondents.**

No. C5–86–900.

Court of Appeals of Minnesota.

Oct. 7, 1986.

Peter H. Grills, O'Neill, Burke & O'Neill, St. Paul, Lawrence G. Acker, Patrick J. Whittle, LeBoeuf, Lamb, Lieby & MacRae, Washington, D.C., for M.A. Hanna Co.

Allen Giles, Minnesota Public Utilities Com'n, St. Paul, for Minnesota Public Utilities Com'n.

Samuel L. Hanson, R. Scott Davies, Briggs & Morgan, Minneapolis, James R. Habicht, Doug Peterson, Minnesota Power, Duluth, for Minnesota Power.

Heard, considered and decided by POPOVICH, C.J., and WOZNIAK and CRIPPEN, JJ.

## OPINION

CRIPPEN, Judge.

This appeal arises from an administrative decision limited to dividing the burden to

pay for electric power among nine users classified as Large Power (LP) consumers of respondent Minnesota Power & Light Co. (MP & L).

## FACTS

The LP consumers of MP & L include seven taconite processing firms, including appellant M.A. Hanna Company (Hanna) and two paper mills. Sixty percent of MP & L's retail sales in the last decade have been to the LP class of consumers.

Between 1976 and 1981, five general rate cases dealt with MP & L rate designs, the appropriate revenue for the utility, and the apportionment of cost among several classes of users. The approved LP rate design included a high "demand" rate for anticipated power demands and a lower "energy" rate for power actually used. In addition, the design called for a "demand ratchet," the requirement for a minimum payment at the demand rate regardless of actual usage. Finally, it was determined that the design could be built into ten year customer contracts terminable only after a five year notice. This rate design was approved for the express purpose of permitting MP & L to recover on its investment in facilities built to meet the needs of the LP class of consumers.

By 1984, the Minnesota taconite industry had begun to suffer economic problems, leading to production cutbacks and plant closings. The LP rate design became very burdensome for some taconite plant consumers. As a result, two administrative cases were commenced early that year. MP & L petitioned for approval of a shorter term consumer contract but with higher demand rates. United States Steel Corporation (USS) filed a complaint asking for reduction of the demand rate and the mini-mum demand ratchet obligation. USS also requested review of the current level of MP & L revenues.

Respondent Minnesota Public Utilities Commission (PUC) ordered a contested hearing before an Administrative Law Judge (ALJ) confined singularly to division of the rate burden among the nine LP consumers; for this hearing the PUC consolidated MP & L's petition and that part of the USS complaint dealing with the LP class rate design. The PUC decided to proceed separately to review the remaining issue raised in the USS complaint, the appropriate revenue level for MP & L.[1]

At the contested hearing, appellant Hanna proposed a rate design with lower demand rates and a lower demand ratchet, together with an offsetting increase in energy rates paid for power actually used. Under this design, less would be paid for reduced use and active users would pay amounts sufficiently increased to offset their own reduced demand rate and the payment reductions enjoyed by reduced use consumers. USS originally had proposed this redesign in its complaint, but it was advocated only by Hanna at the hearing. MP & L advocated its plan for shorter contracts at higher rates.

In October 1985, the ALJ recommended that the present LP rate design remain in effect and rejected the proposals of both Hanna and MP & L. Responding to Hanna's proposal, the ALJ concluded that higher rates for good operations would do further harm to the taconite industry and that the large investments for MP & L facilities, made for all LP consumers, called for further use of the present LP rate design. In its March 1986 order, the PUC agreed. Both the ALJ and the PUC concluded MP & L had failed to show merit for its short

1. In February 1985, the PUC denied the complaint of USS bearing on MP & L revenues. The evidence suggests MP & L revenues have grown at the same time its large customers have had economic problems. Based on present power demand, MP & L must consider steps to reduce its excess production capacity. All the parties anticipate a general rate case to review the level of revenues, the excess capacity problem, and the allocation of cost among classes of users. In his recommended order in the case on appeal, the ALJ recommended that the PUC order MP & L to file its next general rate case "as soon as reasonably possible." The PUC declined to do so in its subsequent order (March 1986), stating it would first review a 1984 MP & L earning report filed in February 1986.

term proposal, and the utility has not appealed.

Did the PUC err in deciding not to alter MP & L's previously approved LP rate design?

### ANALYSIS

#### 1.

Utility rate designs must be "just and reasonable." Minn.Stat. § 216B.03 (1984). The design must be "equitable and consistent in application to a class of consumers." *Id.* Rates shall not be "unreasonably preferential." *Id; see* Minn.Stat. § 216B.07 (1984).

■ Ratemaking is a legislative function. *St. Paul Area Chamber of Commerce v. Minnesota Public Service Commission*, 312 Minn. 250, 254, 260–62, 251 N.W.2d 350, 353–54, 357–58 (1977). As such, these administrative decisions must be upheld unless shown to result in discriminatory rates by clear and convincing evidence. *Id.* at 260, 262, 251 N.W.2d at 357, 358. *See Hibbing Taconite Co. v. Minnesota Public Service Commission*, 302 N.W.2d 5, 9 (Minn.1980); Minn.Stat. § 14.69 (1984). We agree with appellant Hanna that we must review the PUC decision to "ensure" that the rate design it approved is not discriminatory, *St. Paul Chamber of Commerce*, 312 Minn. at 260–61, 251 N.W.2d at 357, but we do not agree that this duty enlarges the scope of review already stated.

#### 2.

■ Appellant has not shown that the present LP rate design unreasonably demands payment from reduced use consumers. The record does not contradict the reason for this design identified by the ALJ and the PUC. It is evident that redesign within the class seriously disadvantages active LP consumers, including taconite processors and paper mills. Hanna contends the present design subsidizes the active operations, a criticism of the design which

only acknowledges that Hanna proposes shifting its costs to other users who remain able to maintain high production.

The PUC concluded that harm to economically healthy operations was damaging to the taconite industry and the community, and it has not been shown that this reason for its action is unsound. In addition, the rate design was originally approved for the express purpose of permitting MP & L to recover from the LP class of consumers its investment in facilities built to meet the needs of each member of that class. In spite of changed economic circumstances, it has not been shown that the ALJ and the PUC unreasonably prolonged use of the original design. Hanna's contention that its proposed design is beneficial to the industry is refuted by the lack of industry support for its proposal as well as by the PUC's determination to avoid further economic disasters through penalties upon active operations.

While not disputing that its proposal would be costly to high volume consumers, Hanna contends this is required to relieve its burden and is a necessary corollary to retention of a high return for MP & L from the LP class. We can discern nothing in these arguments to reflect public policy or private right which makes unreasonable the determination to avoid major cost increases for active power consumers.

#### 3.

Most of appellant's argument on appeal goes beyond the scope of these proceedings, calling into question the right of MP & L to continue enjoying good revenues. Hanna argues insistently that demand rates and minimum payment levels should be reduced. It contends MP & L should be compelled to cope with risks commensurate with unusual perils faced by many of its consumers. It asserts also that the LP class demand rates have always given and continue to give MP & L an unfair and improper revenue security. In addition, Hanna contends that the LP class rate burden ruins the competitiveness of Minnesota taconite producers.

These arguments are appropriate for the case where MP & L net revenues are in issue, but not here.[2]

We agree with the ALJ that the evidence here shows cause for prompt conducting of a general rate case. That recommendation had merit in October 1985 and it has compelling merit in October 1986.

4.

 Appellant contends, finally, that there is a need for a short term rate for LP customers who cannot or will not enter into a new ten year contract. Because the MP & L short term rate was faulted by the PUC, Hanna contends the PUC should have more carefully considered its "far superior" short term rate proposal, suggestions for altering the MP & L proposals that were made as part of the testimony of Hanna's consultant. The PUC found those suggestions to be vague and insufficiently justified. In addition, the PUC faulted the proposal because it was informally presented. The rejection of this alternative was not unreasonably prejudicial to Hanna.

The record makes it evident that the Hanna proposal called for rate reductions without a satisfactory showing that these were offset by any value to preserve MP & L's present, lawfully approved revenues. The PUC found no demonstration of cause for MP & L's proposal for short term rates at higher levels, but the record does not compel setting these rates at lower levels.

**DECISION**

We fail to find clear and convincing evidence that the PUC unreasonably discriminated against Hanna in rejecting its LP rate design proposal or its short term LP rate revision.

Affirmed.

2. The PUC carefully limited the scope of this case to the issue of shifting the power cost among nine LP consumers. It is true that the boundaries for the case were obscured by the PUC's acknowledgement before the hearing that changes in the rates within the LP class "can have a significant impact upon not only individual customers within the class but also upon the stability of revenue recovered by the utility and the apportionment of risk between the company and its customers." The PUC recognized that "one underlying question that may be addressed is how much stability MP & L should have in revenue recovery." Again, the PUC said that MP & L's risk was "a policy consideration to be considered by the parties and the ALJ in recommending an alternative demand rachet provision." However, the primary expectation of PUC in ordering a hearing is quite evident. While MP & L revenues were an "underlying"

issue, the overriding issue was whether power cost should be shifted from some of nine consumers to others in the same class. If that shifting of cost were found feasible, it was clearly important to expand the inquiry to assess the impact on MP & L revenues. However, nothing said by the PUC in ordering this hearing suggests that cause to reduce or risk MP & L revenues would justify an otherwise undesirable shift of costs from one consumer to another. Moreover, there was no suggestion by the PUC that revenue reductions could be considered as a basis for rate decreases without offsetting increases within the class. The PUC announced here: "The overall revenue requirements for MP & L as well as the class revenue requirements for the LP customer class was set in MP & L's last general rate case and not subject to change in the ongoing proceeding."