**In the Matter of the SUMMARY INVESTIGATION INTO INTRASTATE SWITCHED ACCESS CHARGES PROPOSED BY NORTHWESTERN BELL TELEPHONE COMPANY FOR ITS MINNESOTA CUSTOMERS.**

No. CX–86–1556.

Court of Appeals of Minnesota.

March 17, 1987.

Hubert H. Humphrey, III, Atty. Gen., Christopher K. Sandberg, Sp. Asst. Atty. Gen., for Relator Dept. of Public Service.

Karl W. Sonneman, Sp. Asst. Atty. Gen., St. Paul, for respondent Minnesota Public Utilities Com'n.

Stephen T. Refsell, Minneapolis, James A. Gallagher, St. Paul, Allan L. Grauer, Omaha, Neb., for Northwestern Bell.

Considered and decided by WOZNIAK, P.J., and LESLIE and RANDALL, JJ., with oral argument waived.

## OPINION

RANDALL, Judge.

The Minnesota Department of Public Service (DPS) appeals from an order of the Minnesota Public Utilities Commission (PUC). DPS contends that the PUC's decision to grant Northwestern Bell a revenue increase is unsupported by substantial evidence and is arbitrary and capricious. DPS claims Northwestern Bell did not provide evidentiary support for $33.7 million of the revenue it sought. The PUC argues it only revised the rate design, and its decision is not subject to the substantial evidence test. We affirm.

## FACTS

In April 1985, Northwestern Bell Telephone Company (NWB) filed a request with the PUC seeking a change in its rate design and charges for its services for access to and from the national toll network (access charges).

*Background*

This case indirectly arises from the 1984 breakup of NWB from American Telephone and Telegraph Company (AT & T) and from the settlement of an anti-trust case. The Minnesota PUC was required to change telephone rate structures to reflect the effect of AT & T breakup on Minnesota telephone service. In 1984 PUC required local telephone companies to charge long distance toll carriers the same access charges for intrastate access services as the FCC required for interstate access service provided by NWB and other local telephone companies.

Following divestiture, new geographic arrangements known as Local Access and Transport Areas (LATAs) were created to divide traffic between AT & T and its former operating companies. NWB is authorized to provide service within the LATAs. A subsequent MPUC order allows NWB to provide interLATA toll service.

In January 1984, PUC directed NWB and other Minnesota telephone companies to base their intrastate toll access revenue requirement on 1983 data and file their proposed access revenue requirements and rates. The PUC initially considered the question of these intrastate access tariffs in *In Re Investigation Into Intrastate Access Charges of Twenty-Three Rate Regulated Telephone Companies*, MPUC Docket No. P–421/CI–83–203. The PUC considered the rate design necessary to recover revenue from toll access service.

In that proceeding, NWB proposed to replace long distance revenue it was losing with access revenue. PUC approved NWB's proposed access rates and set NWB's toll access revenue requirement at about $96 million. According to the order, most of the "access revenue requirement" was to be recovered by levying toll charges on long distance carriers. Recognizing that its 1984 plan was not a final intrastate access charge plan, but only a transitional

measure, PUC allowed NWB to collect up to $2 a month from local ratepayers in the event of a revenue shortfall.

In its June 29, 1984, order the PUC expressed a desire to move toward a cost-based rather than a mirrored tariff. PUC directed NWB and all other rate regulated companies to file:

> proposed cost-based access charges for 1985, using their own proposed methodologies for defining and allocating intrastate toll costs among the different types of service; * * *.

### Current Case

This appeal arises from the PUC informational filing order. NWB proposed to maintain its 1984 toll access revenue requirement of $107 million. It also proposed to recover an additional $2.5 million in other equal access charges arising from necessary engineering modifications.

NWB claims that the proposed cost-based access rates and the rate design changes are revenue neutral. It characterizes the April 1985 filing as a miscellaneous tariff filing, not a general rate case filing under Minn.Stat. § 237.075 (1984). The PUC accepted the filing as a miscellaneous tariff filing and stated in its order of June 7, 1985:

> The filing proposes no increase in overall revenues for NWB, but does propose significant changes in the design of access rates.

However, the PUC set the matter for formal evidentiary hearing because the filing raised significant issues, "which cannot be resolved in an informal tariff review."

PUC and NWB disagree with the Department of Public Services' charge that NWB's filing proposes an overall increase in access revenues. The PUC found annual access charge revenue should be $109.4 million, which is the actual 1984 toll access revenue and equal access network reconfiguration (EANR) cost. It notes that the purpose of the filing was to reallocate toll revenue requirements in excess of NWB's costs of providing switched toll access. The company also sought to reallocate a portion of 1984 access revenue from interexchange carriers to the end user, which is a change in rate design.

The DPS challenges the higher level of access revenues, not the rate design approved by the PUC. It claims that NWB sought to keep even its 1984 level of revenues resulting in a 12.9% increase over revenue levels approved in prior proceedings.

The DPS now argues that, since the change in rate design for access services resulted in an overall increase in level of the rates, substantial evidence must support the Commission's decision. It claims the PUC's decision is unsupported by substantial evidence, arbitrary and capricious, contrary to law and must be reversed.

On the other hand, NWB, while admitting the actual revenue level in 1984 was "somewhat higher" than the anticipated revenue level, claims it was authorized to retain the additional funds since they were based on authorized rates. NWB contends the increased revenue resulted from growth in demand. The company also contends it adequately supported the rates and revenue level it sought.

### Administrative Law Judge Recommendation

Following a contested case hearing, the ALJ found:

> In addition, NWB proposes to collect $2.5 million through access charges for equal access and network rearrangement costs (EANR). These latter are costs incurred by NWB in its Minneota service area in providing equal access to all interexchange carriers as required by the modified final judgment of the divestiture court. This total of $109.4 million in access revenues would be maintained through 1987. After determining how much revenue would be generated from switched access charges, special access and billing and collecting, and subtracting these amounts from the $109.6 million requirement, NWB determined that a residual amount of $55.6 million must be recovered through the end user and

CCLC charges. During the first year, $32.7 million would be recovered directly from end users and $22.9 would be recovered through the CCLC. At the end of the second year the entire $55.6 million would be collected through end user charges and the CCLC would no longer be imposed on the interexchange carriers.

The ALJ concluded that:

4. The Equal Access and Network Reconfiguration costs proposed to be recovered by NWB are appropriate.

5. The recovery of gross receipts taxes by NWB from interexchange carriers as previously approved by this Commission is appropriate.

\*　　\*　　\*　　\*　　\*　　\*

8. NWB should be authorized to collect annual access charges from interexchange carriers at the level proposed herein less the $1,275 million for billing inquiries as discussed above.

\*　　\*　　\*　　\*　　\*　　\*

In a recommended order, the ALJ determined that NWB should recover its 1984 level of access charges.

*Commission Order February 24, 1986*

The PUC found:

As part of its April 26th filing, NWB proposed to recover sufficient revenues from access services so as to maintain its present annual revenue stream from access services through 1987. This annual revenue from access services was estimated to be $109.4 million (which includes Equal Access Network Reconfiguration Costs of $2.5 million not previously included). Of this total amount, NWB proposed to collect $55.6 million from its local customers (end users) at the end of a two year transition period. During the first year of the transition period, NWB proposed that $32.7 million be collected from end users through a $2.00 per month charge. The $2.00 charge would increase to approximately $3.31 by the end of the second year to recover the $55.6 million. NWB characterized the $55.6 million as a residual revenue re-

quirement. NWB proposed to collect the remainder of the $109.4 million from interexchange carriers through switched and special access charges, billing and collection fees, and, during the transition, the Common Carrier Line Charge (CCLC).

The Commission found that NWB must adjust its residual revenue requirement to remove 1984 billing inquiry revenues collected from AT & T and other modifications, and it approved the residual revenue requirement.

The PUC further found:

Although the Commission will approve the residual revenue requirement in this case with slight modifications, the Commission is concerned that NWB did not adequately identify the component parts of the residual. The Commission also finds that NWB did not meet its obligation to identify NTS costs. It cannot be determined from the record of this case whether a component of the residual is the NTS costs of intrastate interLATA access.

Under Minn.Stat. § 237.081 (1984), the Commission may investigate any matter related to telephone service. The Commission finds that the residual revenue requirement has so many questions associated with it that the public interest requires, in lieu of a general rate case and examination of NWB's present revenue requirements, an investigation of the residual as presented in this proceeding. Under Minn.Stat. § 237.081 (1984), the Commission will initiate a summary investigation to examine the reasonableness of the residual revenue requirement ultimately calculated after compliance in this proceeding. The DPS will be directed to conduct the summary investigation on behalf of the Commission and file a report with the Commission on October 1, 1986. This investigation should evaluate the residual as to whether it includes NTS costs, and what those NTS costs are and what other costs are included in the residual. NWB shall cooperate in every manner possible with the investigation

and respond to DPS information requests within 10 working days of their service date.

The Commission order stated:

3. The residual revenue requirement shall be calculated in the following manner: $109.4 million less:

(a) the amount of revenue collected through switched access charges with adjustments to such revenue recovery for Commission ordered charges in non-premium rates.

(b) special access and billing and collection revenues.

(c) the adjustment to remove excess uncollectibles reflected in the proposed $55.6 million residual.

(d) the adjustment to remove the billing inquiry revenues reflected in the proposed $55.6 million residual.

(e) the adjustment to remove excess uncollectibles reflected in the proposed $37.7 switched access revenue requirement.

(f) the adjustment to EANR costs to reflect final FCC requirements.

Within 30 days of the service date of this Order, NWB shall provide to the Commission and all parties documentation showing all calculations and adjustments and the resulting residual revenue requirement.

\* \* \* \* \* \*

8. In the next NWB access proceeding and/or NWB general rate case, NWB shall identify its NTS costs of intrastate access and provide documentation that supports the identified amounts.

*Commission Order After Reconsideration*

NWB and other parties petitioned the PUC for reconsideration of its February 24, 1986, order. On June 25, 1986, after reconsideration, the PUC issued a clarifying order which did not affect its final decision.

Relative to the residual revenue requirement at issue in this appeal the PUC stated:

In the Final Order, the Commission found that NWB did not meet its obligation to identify NTS costs. In response to the Final Order, NWB argued that the Commission had issued an Order on August 30, 1984, in Docket No. P–421/C1–83–203, eliminating the requirement that traffic sensitive and NTS costs be split when provided in the supporting documentation accompanying the 1984 interLATA access plan compliance filing. Therefore, NWB argued it should not be faulted now. NWB also said that it did make NTS cost data available in the record of this proceeding.

The Commission finds that the August 30, 1984 Order was intended to be directed at those companies that were unable to provide a split of the traffic sensitive from the NTS costs, specifically the average schedule telephone companies. NWB is not an average schedule company. However, the August 30th Order was not clear on the distinction between average schedule companies and cost-based companies which do have the ability to split costs between traffic sensitive and NTS allocations. The Commission will not fault NWB in this instance for non-compliance. However, the Commission made it clear in its Final Order, and reaffirms that decision in this Order, that NTS costs should be identified by NWB in the future.

## ISSUE

Is the PUC's decision to allocate revenue responsibility among customer classes one of rate design, even though it results in increased revenue from a previous Commission order?

## ANALYSIS

Minn.Stat. § 14.69 (1984) provides that a reviewing court may affirm an agency's decision or reverse or modify if the decision is:

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Made upon unlawful procedure; or

(d) Affected by other error of law; or

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary and capricious.

It is fundamental that agency decisions enjoy a presumption of correctness. *Crookston Cattle Co. v. Minnesota Department of Natural Resources*, 300 N.W.2d 769, 777 (Minn.1980).

■ Proceedings before the PUC involve two different agency functions, quasi-judicial and legislative. Answering factual questions involves a quasi-judicial function. When balancing facts, policies, or interests, the PUC exercises its legislative functions. *See* Minn.Stat. § 216A.05, subd. 1 (1984). When determining the level of revenue to be earned by a public utility, the PUC acts in a quasi-judicial role. However, establishing rate design is a legislative function. The standard of review under these functions differs.

■ When an agency engages in a quasi-judicial function, the reviewing court must apply the substantial evidence test. *Hibbing Taconite Co. v. Minnesota Public Service Commission*, 302 N.W.2d 5, 9 (Minn.1980). Substantial evidence is:

1. such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; 2. more than a scintilla of evidence; 3. more than "some evidence"; 4. more than "any evidence"; and 5. evidence considered in its entirety.

*Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 825 (Minn.1977). Appellant (objector) has the burden to show that the agency's findings are not supported by evidence on the record. *Id.* If an agency's decision is reasoned and explained on the record, it will be upheld by an appellate court even if the court would have come to a different conclusion. *See Brown v. Wells*, 288 Minn. 468, 472, 181 N.W.2d 708, 711 (1970).

■ When reviewing an agency's legislative decision, a court will uphold the agency unless its decision is shown by clear and convincing evidence to result in discriminatory rates. *See City of Moorhead v. Minnesota Public Utilities Commission*, 343 N.W.2d 843, 848 (Minn.1984) (citation omitted).

■ In this case, we find the PUC approved a rate design change. Revenues permitted to be recovered stay at the same level as those recovered in 1984. Although, the 1984 revenue level was higher than that approved in a previous rate case, there was no allegation that NWB exceeded its permitted rate of return or overall revenue level.

■ Therefore, since this is a rate design case, the PUC will be reversed if the DPS demonstrates by clear and convincing evidence the PUC order setting revenues at 1984 levels is unjust, unreasonable, or discriminatory. *See id.* We find NWB's revenue increase was based on authorized rates and is thus not subject to review under the substantial evidence test. In *Petition of Minnesota Power Co.*, 394 N.W.2d 231 (Minn.Ct.App.1986), this court upheld the PUC's rate design decision where there was no clear and convincing evidence showing the design to be discriminatory. Here, as in *Petition of Minnesota Power Co.*, revenues were an underlying issue in the case. The court noted that the overriding issue was whether costs should be shifted among customer classes. *Id.* at 234, n. 2.

Since this case is one of rate design, even if revenues are an underlying issue, the PUC's action was predominantly legislative in nature. If the PUC refused to permit a redesign of rates, NWB would not earn its authorized revenue requirement set in the last rate case. It is settled that rates in excess of a reasonable return on investment are confiscatory. *State v. Tri-State Telephone & Telegraph Co.*, 204 Minn. 516, 532, 284 N.W. 294, 305 (1939).

As the PUC points out, this case was prompted by PUC's own request. It noted, in its order after reconsideration, that it could not fault NWB for not providing

more specific cost information because of ambiguous commission orders. Further, costs are not the only factor the PUC may consider. With regard to rate design decisions the PUC may:

> [B]alance factors such as cost of service, ability to pay, tax consequences, and ability to pass on increase in order to achieve a fair and reasonable allocation of increase among consumer classes.

*St. Paul Area Chamber of Commerce v. Minnesota Public Service Commission,* 312 Minn. 250, 260, 251 N.W.2d 350, 357 (1977).

■ Appellant implies that the PUC acted arbitrarily by allowing revenue to remain at the 1984 level. An agency's decision is arbitrary and capricious "when the determination represents the agency's will and not its judgment, or when the decision is without evidence to support its conclusion." *Beaty v. Minnesota Board of Teaching,* 354 N.W.2d 466, 471 (Minn.Ct. App.1984) (citation omitted). In this case both the ALJ and the PUC used a revenue-neutral approach to arrive at the decision. Both the ALJ and the PUC considered the case one of rate design where, except for the increase due to increased sales, NWB was not attempting to increase its revenues or the rate of return. There is no support in the record for the contention that the decision reflects the agency's will rather than its judgment. The DPS has not met its burden of proof in this case.

## DECISION

The PUC's decision approving a change in rate for NWB is not unjust, unreasonable, or discriminatory by clear and convincing evidence.

Affirmed.