## JACKIE ROBERTS v. DeKALB AGRICULTURAL ASSOCIATION, INC. AND ANOTHER.[1]

*July 1, 1949.*

No. 34,934.

*G. W. Mantor,* for relator.

*Reynolds & McLeod,* for respondents.

MAGNEY, JUSTICE.

Certiorari to the industrial commission to review an order denying compensation.

In July 1944, Jackie Roberts, then 14 years of age, was employed by respondent DeKalb Agricultural Association, Inc., to detassel ears of corn and pull out suckers. One morning, some days prior to August 4, a number of boys, including Roberts, worked in a horizontal line along the rows of corn. He lagged behind. He claims that Donald Anderson, a boy about 16 years of age, an assistant foreman or "straw boss," kicked him back of his left hip—

[1]Reported in 38 N. W. (2d) 189.

"back part of that [hip]bone"—while he was stooping over to pick up a sucker. He did not fall over. Anderson told him he was not going fast enough. Employe continued to work. He noticed a black-and-blue spot where he had been kicked, and he limped once in a while, but the other boys did not notice it. At the hearing, he testified that he had a little pain after the kick and that he must have continued to work about a week. During that period he said his "leg hurt once in a while." He said he had pains a couple of times after he was kicked. He was asked: "By 'once in a while' you mean it bothered you just periodically?" He answered: "Yes; sometimes when [we] were working the kids get down behind and shove you over and it started hurting lots of times. * * * my hip hurt when they shoved me down like that." Apparently the boys engaged in some "horseplay." Before entering the Worthington Hospital, the information given to Dr. E. A. Kilbride was that employe had been kicked several days before by another boy while they were detasseling corn. He said he worked a few days and then became sick. When he entered Gillette Hospital, he told two interns that he had been kicked but said nothing to Dr. Harry B. Hall about it. He was not asked any questions concerning an accident. On September 7, 1944, employe gave a written statement to an adjuster of employer's insurer in which he stated that he had been kicked and pushed. In that statement he also said: "My leg did not hurt at any time after being kicked up until the Saturday I tried to get up." The statement was witnessed by employe's parents. He did not mention the incident to his foreman or anyone else until he was incapacitated. On August 4, he again went out with the crew, but felt ill from headache and an ache in his left hip. Early in the afternoon he came home and went to bed. His mother testified that when he came home he limped, and that she had seen him limp a few days before. He said that he had been kicked by the Anderson boy. He ate no supper. The next morning he was unable to get out of bed. The following day Dr. Kilbride was called to attend him. On August 8 he was hospitalized. Mrs. Roberts, employe's mother, told Dr. Kilbride on his first call that

her son said he had been kicked by another boy while on the job. At the hospital, employe's illness was diagnosed as osteomyelitis of the left hip joint. He remained in the Worthington General Hospital until January 17, 1946, when he was transferred to the Gillette State Hospital for Crippled Children in St. Paul. He was totally disabled from August 5, 1944, to the date of the hearing, April 1, 1948.

In his petition for compensation dated July 20, 1946, employe states:

"That the character and extent of said injury was as follows: Fracture of the neck of the left femur, followed by infection as a result of a kick or fall."

The referee found that on or about August 2, 1944, employe sustained an accidental injury to his person which arose out of and in the course of his employment. He also found that—

"following said injury and on or about August 5, 1944, employe became disabled with an osteomyelitis of his left hip joint, but that said osteomyelitis was not the result of the accidental injury which occurred on or about August 2, 1944, but was due to and a result of a diseased condition wholly unrelated to the accidental occurrence of August 2, 1944, nor did the accidental injury of said date aggravate a pre-existing condition."

The findings of fact and determination by the referee were affirmed by the industrial commission.

■ Employe claims that his osteomyelitic condition and incapacity resulted from the kick he received on or about August 2, 1944. Respondents contend that there is no relationship of cause and effect between the incident and the unfortunate condition of employe. Because of the time sequence between the kick and the onset of the disease, a layman would readily conclude that there must be a relationship of cause and effect between the two. However, osteomyelitis is a blood-borne bacterial infection involving the bony structure. Whether in any specific case its assault is traumatic in

its origin or aggravation must be left for determination by medical experts, whose learning and experience have qualified them to do that very thing. Upon such expert medical testimony, the industrial commission has determined that the kick and the disease were coincidental and that the first was not the cause of the second. In order to determine whether the industrial commission had sufficient fact and legal basis for its determination, we must analyze the medical testimony presented.

Dr. Kilbride, a general practitioner, first attended employe, as stated. In his opinion, "the infectious process which was caused by the trauma to the part was of such nature as to involve the bone with inflammatory and destructive processes * * *." When he saw the first X ray, he diagnosed the condition as "Trauma to the hip joint and an oncoming osteomyelitis." He stated that the history as given him was a true history of oncoming disease, and he assumed that the kick "would be a causative factor to the oncoming disease process." He said that he could not say whether employe had some infection before he was kicked. "He worked. He didn't have a temperature. If he had had much infection he would have had a fever." But he felt that employe had an inflammatory process coming on in his left hip. He testified:

"* * * In other words, if the boy was kicked, when he was kicked he thought little of the injury. It was of a minor nature probably at the time. There were several days when it didn't even bother him."

He also said that he assumed the kick was the "exciting factor," with the history of trauma and knowing the nature and severity. He said he would not assume that a kick would come near the bone—it "wouldn't touch the bone." He also stated that there was no incision, unless it was a microscopic puncture or bruise, and that he recalled no area of ecchymosis. He said that "the blood borne infection would localize or set itself or cause its initial trouble in the site of an injury." He defined osteomyelitis as an

involvement of the bony structure caused by a bacterial infection. He answered affirmatively this question:

"So that unless there is an actual destructive blow to that covering, you have to speculate on the question of trauma having disturbed some of the underlying structure and particularly the blood supply to form an area of lowered resistance and involve infection?"

He made no mention of any soft tissue abscess which could or did cause bone infection.

Dr. W. H. Halloran, of Jackson, who specialized in general surgery, was called into consultation by Dr. Kilbride and appeared as a witness for employe. He was asked:

"* * * have you an opinion, doctor, as to the possibility of such a train of events lighting up a dormant or latent condition known as osteomyelitis so as to bring a flare of the disease which localized in the hip?"

To which he replied:

"I would consider that a possible eventuality."

He said that it was common for trauma which causes bruising to light up or aggravate the condition known as osteomyelitis. He assumed from the history that employe had an injury. He did not testify that in his opinion there was a relationship here of cause and effect between the kick and the osteomyelitic condition. He testified only in regard to osteomyelitis in general.

Dr. A. H. Pedersen, a pathologist and surgeon, was called as an expert witness for employe. He stated that trauma may be a factor in osteomyelitis, but he felt that osteomyelitis is not caused by trauma alone. He said that one may have a bone abscess without symptoms. If such abscess is in a dormant or latent condition, it can be lighted up through trauma or sufficient external force supplied in the neighborhood of the infection. In answer to a hypothetical question on direct examination, he said:

"I mean that he has had a bacterial infection of the hip joint which also involved the ilium and ischium, but the relationship of

the injury I don't know. I can't say. If he had a disease which was full blown at the time, I suppose that a kick in that region could accelerate it."

He was asked:

"Assuming that the infection was present, but dormant, or was in the beginning stages of a spontaneous flare up, could the kicking incident and the following circumstances light up, accelerate or aggravate a pre-existing condition?"

His answer was: "It is possible." He said that the head of the femur at about the epiphysial is probably the most common site for the location of osteomyelitis, and also most common in the age bracket of employe. The physicians called seemed to agree to those propositions. Dr. Pedersen said that there was nothing in the X-ray plates to distinguish this particular case from the ordinary case of a spontaneous eruption of a hematogenous osteomyelitis. Upon the history itself, he said that there was nothing upon which one could predicate the assumption or the conclusion that injury itself had been transmitted to the head of the femur. He was asked:

"As you view the entire case, is there anything in this case to differentiate it from the ordinary acute osteomyelitis common in young people the age of this boy at that time that springs up spontaneously?"

He answered:

"From the x-rays and from the findings I would say No, except that this boy presents the history that he was kicked and he had discoloration in the region of the hip."

He said that if the process had not erupted through the cortex of the bone the trauma would have no effect on it. The sudden manifestation of severe incapacitating illness is not incompatible with ordinary acute osteomyelitis. It may continue in a rather sub-acute fashion for a considerable period of time before the real acute manifestation sets in. On redirect examination he said:

. "The history in this case is such that the boy was kicked in the hip. Now, if the boy had a process going on in the hip, and he was struck directly on the bone, and that process was taking place, it could accelerate it. I cannot say whether it did or did not, but I say it could."

He was asked:

"Can damage to the soft parts be sufficient to light up such a condition and cause the disease to go on its normal course?"

He replied:

"It all depends upon the situation of your abscess. If your abscess is sub-periosteal or in the region of the periosteum, damage to the soft parts could, but if it were deep seated and within the bone, it would have to involve the cortex of the bone before it could involve the abscess."

So far, in more detail than was probably necessary, we have reviewed the medical testimony produced in behalf of employe. Aside from Dr. Kilbride, such testimony on the question of cause and effect was rather indefinite and unsatisfactory.

Dr. Harry B. Hall, a specialist in orthopedic surgery and a member of the staff of Gillette State Hospital for Crippled Children, was called by respondents. He had treated employe at that hospital. He testified that in his opinion, assuming the story was true, that the boy's osteomyelitic process had already started before he received the kick, and that the kick would have no influence on it. He was asked:

"Is it fair to say that trauma of certain type and character when applied to a bone afflicted with an osteomyelitis may cause or produce an aggravation of that condition?"

He answered in the affirmative. He said that if employe had sustained a trauma of such nature and severity to a condition preexisting at the time the trauma was applied there would have to be some signs of injury, such as a large hematoma or a fracture

of the bone or a bruising of the bone directly, which would change the pathology that was already present, in order to accept the fact that an aggravation had been caused by such a blow. Such a blow in and of itself would likely cause symptoms of disablement along with the osteomyelitis. The head of the femur is well protected from direct trauma. In his opinion, the blow had no significance as far as aggravation of employe's osteomyelitis was concerned. He said:

"* * * The process was just developing, and I don't believe there was any relationship between the kick and the hematogenous osteomyelitis in either the kick being a causation factor or an aggravation factor."

Dr. Wallace Cole, who has practiced orthopedic surgery since 1914 and who is head of the orthopedic service at the University Hospital, chief surgeon at the Shriners Hospital for Crippled Children, and an associate chief surgeon of the Gillette State Hospital for Crippled Children, was called by respondents. He testified that he could see no connection between the kick and the development of the condition of osteomyelitis with which employe was suffering. In his opinion there was a blood-borne infection. "I should say so very definitely," he said. He also said that if the trauma is severe enough osteomyelitis can be aggravated by it.

Because of the seriousness of the situation, we have related in considerable detail, though not fully, the medical testimony in the case. On such medical testimony, the industrial commission found that there was no causal connection between the kick and the osteomyelitic condition. Under well-known rules, which we have repeatedly restated, we find no basis for disturbing the finding of the commission.

■ Employe contends, however, that certain opinions given by the medical experts were elicited by means of improperly framed hypothetical questions, and that therefore no weight could or should be given to such testimony. The first such question was asked of Dr. Kilbride on cross-examination. We see nothing improper in

the question, but, if it was improper, no damage resulted to employe's case, as the doctor answered: "Then he begins to become sick in the same relative location at which he had been kicked. I mean he developed pain. I assume that that would be a causative factor to the oncoming disease process." The questions put to Dr. Pedersen, to the form of which employe objects, were just the ordinary questions put to an expert witness on cross-examination. The hypothetical questions put to Dr. Hall and Dr. Cole on direct examination were unobjected to at the time. Furthermore, some of the defects now claimed are immaterial, and others do not exist in fact. We see no error along the lines suggested which necessitate correction.

Order affirmed.