In the Matter of the Petition of OTTER TAIL POWER COMPANY for Authority to Increase Rates for Electric Service in Minnesota.

OTTER TAIL POWER
COMPANY, Relator,

v.

MINNESOTA PUBLIC UTILITIES COMMISSION, Minnesota Department of Public Service, Superwood Corporation, et al., Respondents.

No. C2–87–1304.

Court of Appeals of Minnesota.

Jan. 5, 1988.
Review Denied March 23, 1988.

Katherine E. Sasseville, Fergus Falls, for Otter Tail Power Co.

Hubert H. Humphrey, III, Atty. Gen., Karl W. Sonneman, Sp. Asst. Atty. Gen., St. Paul, for Minnesota Public Utilities Com'n.

Christopher K. Sandberg, Sp. Asst. Atty. Gen., St. Paul, for Minnesota Dept. of Public Service.

James D. Larson, Wurst, Pearson, Larson, Underwood & Mertz, Minneapolis, for Superwood Corp., et al.

Dennis D. Ahlers, Sp. Asst. Atty. Gen., St. Paul, for Office of the Atty. General.

Heard, considered and decided by HUSPENI, P.J., and SEDGWICK and LOMMEN *, JJ.

## OPINION

HUSPENI, Judge.

On June 26, 1986, relator Otter Tail Power Company ("Otter Tail") filed a petition with the respondent Minnesota Public Utilities Commission ("Commission"), seeking an increase in retail electric rates of $13,-905,238 and interim rates in the amount of $12,606,922. The Commission set interim rates in the amount of $10,782,984 and directed that a contested case hearing be conducted by an Administrative Law Judge ("ALJ") to determine the reasonableness of Otter Tail's proposed rate increase.

Parties to the contested case hearing included Otter Tail, the Minnesota Department of Public Service, Superwood Corporation, and the Minnesota Attorney General. Following the hearing, the ALJ issued recommended findings and an order. After reviewing the ALJ's order, the Commission issued its own findings and conclusions and authorized a final rate increase in the amount of $7,259,559.

Otter Tail's request for reconsideration was denied by the Commission, and Otter Tail appealed to this court from the final rate order and the interim rate order. We affirm.

## FACTS

Otter Tail is an electric utility regulated by the respondent Commission. Otter Tail's headquarters are located in Fergus Falls, Minnesota, and the company supplies

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

electric power to communities and surrounding rural areas in western Minnesota.

Otter Tail proposed a capital structure including 45.79 percent common equity, and requested a 13 percent rate of return on common equity. Otter Tail also requested rate base treatment of planning and engineering costs incurred in connection with a canceled generating project located in Spiritwood Township, North Dakota.

In setting interim rates prior to the contested case hearing, the Commission reviewed documentation and testimony filed with Otter Tail's request, and received suggestions and recommendations from Commission staff. The Commission found that exigent circumstances existed, and adopted a 45 percent hypothetical equity ratio instead of the 45.79 percent equity ratio proposed by Otter Tail. The Commission also adopted an 11.31 percent rate of return on equity, which was lower than the 13 percent requested by Otter Tail or the 14.85 percent authorized in Otter Tail's most recent rate proceeding in 1982.

Following the contested case hearing, the ALJ recommended that the Commission adopt Otter Tail's proposed common equity ratio of 45.79 percent; that Otter Tail be allowed a 12.41 percent rate of return on common equity; and that rate recovery be allowed for the canceled Spiritwood project.

After reviewing the ALJ's findings and recommendations, the Commission issued its own findings and conclusions, reversing the ALJ on three issues. The Commission reinstated the hypothetical equity ratio of 45 percent which it had adopted when setting interim rates; ordered a 12 percent rate of return on common equity; and denied rate recovery for the Spiritwood project. The Commission authorized a final rate increase in the amount of $7,259,-559.

## ISSUES

1. Did the Commission conduct an interim rate proceeding in violation of statutory provisions and in violation of Otter Tail's due process rights?

2. Did the Commission erroneously adopt a 45 percent hypothetical equity ratio?

3. Did the Commission err by setting a 12 percent rate of return on common equity?

4. Did the Commission err by denying a return on capital invested in the canceled Spiritwood project?

## ANALYSIS

1. Interim Rate Proceedings

Minn.Stat. § 216B.16, subd. 3 (1984), governing the establishment of interim rates, provides:

> Interim rates.  * * *  [T]he commission shall order an interim rate schedule into effect not later than 60 days after the initial filing date. The commission shall order the interim rate schedule ex parte without a public hearing.  * * *  [N]o interim rate schedule ordered by the commission pursuant to this subdivision shall be subject to an application for a rehearing or an appeal to a court until the commission has rendered its final determination. Unless the commission finds that exigent circumstances exist, the interim rate schedule shall be calculated using the proposed test year cost of capital, rate base, and expenses, except that it shall include: (1) a rate of return on common equity for the utility equal to that authorized by the commission in the utility's most recent rate proceeding;
> * * *
>
> If, at the time of its final determination, the commission finds that the interim rates are in excess of the rates in the final determination, the commission shall order the utility to refund the excess amount collected under the interim rate schedule, including interest on it which shall be at the rate of interest determined by the commission.

Otter Tail claims the Commission failed to comply with the requirements of this statute, thereby denying it due process.

■ In order to obtain relief on appeal, a party must generally establish that it has been prejudiced as a result of a tribunal's

actions. This is true in administrative, as well as judicial, proceedings. *See, e.g., Roberts v. DeKalb Agricultural Association,* 229 Minn. 188, 38 N.W.2d 189, 193 (1949) (question asked on cross-examination did not result in damage to relator).

■ Here, the record does not reveal that Otter Tail has demonstrated injury as a result of the allegedly improper procedures. While the interim rates set by the Commission were lower than those requested by Otter Tail ($10,782,984 instead of $12,606,922), the final rate increase allowed by the Commission was $7,259,559. The establishment of this lower final rate meant that Otter Tail was required to return to its rate payers any excess rates collected during the interim rate period. Minn.Stat. § 216B.16, subd. 3. If Otter Tail had received a higher interim rate, it would have been required to repay a higher amount after the final rate increase was established.

Otter Tail claims it was injured as a result of the proceedings because the Commission arbitrarily and capriciously adopted in its final order the 45 percent equity ratio figure which it had used in the interim rate proceedings. The adoption of this 45 percent equity ratio figure contributed to the reduction of Otter Tail's proposed final rate request from $13,905,238 to $7,259,559.

■ An agency's determination is arbitrary and capricious when it represents the agency's will and not its judgment. *Peoples Natural Gas Co. v. Minnesota Public Utilities Commission,* 342 N.W.2d 348, 351 (Minn.Ct.App.1983) (citing *Markwardt v. State, Water Resources Board,* 254 N.W.2d 371, 374 (Minn.1977)). Here, Otter Tail's argument that the Commission arbitrarily reinstated the equity ratio figure that it had adopted in the interim rate proceeding is speculative, and without any real support in the record. In fact, the Commission's final order demonstrates an independent and lengthy examination and explanation of the equity ratio issue.

We also note that the Commission changed its determination on Otter Tail's rate of return between the interim and final orders, demonstrating that the Commission did take a new look at the evidence when issuing its final order, rather than simply relying upon its decision in the interim rate order.

■ Even if Otter Tail could demonstrate injury as a result of the allegedly irregular interim rate proceedings, we are not convinced that those proceedings were, in fact, improper. Otter Tail raises allegations of advocacy against its interests by Commission staff and counsel, which Otter Tail claims rendered the interim proceeding more than the "ex parte" proceeding required by Minn.Stat. § 216B.16, subd. 3. Otter Tail argues that the term "ex parte" was intended by the legislature to render the Commission's actions ministerial, rather than discretionary; thus, Otter Tail concludes that the Commission acted improperly in examining and discussing Otter Tail's proposal at length to determine whether it was reasonable.

The term "ex parte" does not require that the Commission simply adopt a utility's proposal with no examination. Indeed, in filing its petition for an interim rate increase, Otter Tail also filed testimony and documentation in support of that proposal. Certainly, the Commission must be expected to examine the evidence.

The legislature has provided that "unless the Commission finds that exigent circumstances exist," the Commission should calculate an interim rate schedule in accordance with procedures set forth in the statute. Minn.Stat. § 216B.16, subd. 3. In order for the Commission to find "exigent circumstances," the Commission must first analyze the petition and accompanying evidence.

The transcript of the interim rate proceedings does not reveal that the Commission staff and counsel were acting as "advocates" of a position contrary to Otter Tail. Rather, the Commission staff and counsel simply acted as advisors, making suggestions and recommendations, and informing the Commission of possibilities based upon their knowledge and expertise.

## 2. Equity Ratio

A company's overall capital structure consists of equity, debt and preferred stock. "Equity ratio" is the percentage of common equity within the total capital structure.

Otter Tail claims the Commission erroneously adopted a 45 percent hypothetical equity ratio in its final order, rather than accepting Otter Tail's proposed 45.79 percent equity ratio. Otter Tail first argues that the Commission erred by applying the wrong burden of proof.

■ The Commission placed the burden upon Otter Tail to prove that its proposed capital structure was reasonable, citing Minn.Stat. § 216B.16, subd. 4 (1986), which states:

The burden of proof to show that the rate change is just and reasonable shall be upon the public utility seeking the change.

In light of the recent decision of the Minnesota Supreme Court in *In Re Northern States Power Company*, 416 N.W.2d 719 (Minn.1987), we conclude the Commission correctly placed upon Otter Tail the burden of proving its capital structure reasonable and just. *See id.*, at 726.

In reviewing the Commission's adoption of a 45 percent hypothetical equity ratio, we must determine whether the Commission has adequately explained the reason for its conclusion that Otter Tail's proposed ratio was not just and reasonable, and whether the Commission's conclusion itself was reasonable. *Id.*, at 726–727. The Commission explained its rejection of Otter Tail's proposed capital structure as follows:

OTP argued that it had made a conscious decision since the time of its last rate case that it needed a stronger capital structure. The Commission does not disagree with OTP that some level of increase in its equity ratio over the last five years was warranted * * *. However, the Commission cannot conclude from that information that a 46.93% equity ratio [1] is appropriate for the test year

or that a continuation of the upward trend is warranted; in fact, the record leads to an opposite conclusion. Inflation and interest rates have been declining, utility stock prices including OTP's have been rising and OTP is not projecting a need for major construction financing in the near future. The Commission finds that conditions in the capital market reasonably expected to prevail during the test year do not warrant an equity ratio as high as that initially proposed by OTP.

\* \* \* \* \* \*

The ALJ adopted OTP's revised capital structure proposal, on the grounds that the 45.79% equity ratio was not shown to be unreasonably high and, given OTP's small size and greater risk, was comparable to industry standards. The Commission rejects the first reason given by the ALJ because the absence of evidence to the contrary is not sufficient grounds to support OTP's revised proposal. The ALJ should have held the Company to its burden of proof. With respect to the second reason given by the ALJ, the Commission has determined above that OTP is not riskier than the average electric utility or Dr. Thompson's comparable group.[2] Thus, the Company's revised capital structure does not fall within a normal, reasonable range based upon an analysis of comparable utilities.

The Commission also explained why it preferred a 45 percent equity ratio to that proposed by Otter Tail:

[A] 45.00% equity ratio provides a reasonable balance between investor and consumer interests.

\* \* \* \* \* \*

The Commission concludes that a capital structure containing 45.00% equity, 9.94% preferred stock, 43.13% long term debt and 1.93% other debt for OTP in the test year fairly balances the interests of ratepayers and investors, and will allow OTP to maintain its financial integrity and raise capital on reasonable terms.

---

1. Otter Tail initially proposed a capital structure containing a 46.93 percent equity ratio.

2. Otter Tail's relative risk is discussed in Issue 3, below.

The Commission recognizes that the resulting overall rate of return allowed OTP in this proceeding will not be greatly different using the 45.00% equity ratio rather than a ratio of 45.79% * * *. However, the Commission finds the use of the 45.00% equity ratio appropriate in order to resolve all doubt in favor of the ratepayer, to implement the policy decisions herein, and to emphasize the Commission's concerns about OTP's high equity ratio. The Commission has found that 45% is the maximum equity ratio which can be considered reasonable for OTP in this proceeding. If OTP management chooses to maintain a higher than needed equity level, then shareholders, not ratepayers, should be responsible for the increased cost of capital.

The Commission is concerned about the continuing upward trend in OTP's equity ratio.

The Commission noted Otter Tail's argument that Standard and Poor's guidelines supported the reasonableness of Otter Tail's proposed equity ratio of 45.79 percent, since the Standard and Poor's guidelines suggested a 38 percent to 46 percent equity ratio for A–Rated utilities and a 44 percent to 51 percent ratio for AA–Rated utilities. The Commission, however, found that the Standard and Poor's guidelines did not show a 45.79% equity ratio to be more reasonable than a 45.00% equity ratio.

■ We cannot conclude that the above concerns expressed by the Commission are unreasonable. The Commission adequately explained its reasons for rejecting Otter Tail's proposed capital structure and adopting a hypothetical capital structure instead.

3.  Rate of Return on Common Equity

In its briefs to the Commission, Otter Tail requested a 13 percent rate of return on common equity. After reviewing the record and the ALJ's recommendation of a 12.4 percent rate of return, the Commission adopted a 12 percent figure. Otter Tail claims that by so doing, the Commission ignored substantial evidence in the record.

In *Hibbing Taconite Co. v. Minnesota Public Service Commission*, 302 N.W.2d 5 (Minn.1980), the court stated:

[T]he establishment of a rate of return involves a factual determination which the courts will review under the substantial evidence standard.

*Id.* at 9. The court noted, however, that in order to facilitate proper review of the Commission's decision, the Commission must set forth the factual basis for its determination: "Judicial deference to the agency's expertise is not a substitute for an analysis which enables the court to understand the PSC's ruling." *Id.* at 12. The *Hibbing Taconite* court also cited the legal criteria which the Commission must follow in establishing a rate of return:

Every rate made, demanded, or received by any public utility * * * shall be just and reasonable. Rates shall not be unreasonably preferential, unreasonably prejudicial or discriminatory, but shall be sufficient, equitable and consistent in application to a class of consumers.

*Id.* at 10, quoting from Minn.Stat. § 216B.03 (1978).

The commission * * * shall give due consideration to the public need for adequate, efficient, and reasonable service and to the need of the public utility for revenue sufficient to enable it to meet the cost of furnishing the service * * * and to earn a fair and reasonable return upon the investment in such property.

*Id.*, quoting from Minn.Stat. § 216B.16, subd. 6 (1978). The court noted that, when considering these factors, the Commission must balance the interests of the utility against the interests of the utility's customers. The court stated:

Rates which are not sufficient to yield a reasonable return on the value of the property used, at the time it is being used to render the service, are unjust, unreasonable, and confiscatory, and their enforcement deprives the public utility company of its property in violation of the Fourteenth Amendment.

*Hibbing Taconite*, 302 N.W.2d at 10, quoting from *Bluefield Waterworks and Improvement Co. v. Public Service Commis-*

*sion,* 262 U.S. 679, 690, 43 S.Ct. 675, 678, 67 L.Ed. 1176 (1923).

In the present case, three experts testified on behalf of Otter Tail: Dennis Emmen, Daniel Rudakas, and Dr. Jerome Hass. Dr. Luther Thompson testified for the Department of Public Safety, and Derick Dahlen testified on behalf of Superwood. All witnesses except Dahlen used a discounted cash flow (DCF) analysis as at least one factor in estimating Otter Tail's rate of return.

The Commission described the DCF method as follows:

> Under the DCF method, the cost of equity is inferred by observing past and present market data on the price of the stock and the dividend being paid and making reasoned judgments of investor expectations for the future. Investors collectively determine the market price of common stock by their willingness to buy or sell the stock at various prices. Essentially, the DCF analyst is trying to determine what interest rate investors are using to discount the expected future flow of dividends and stock price appreciation to a present value equal to the current price of the stock. That interest rate is the market-required rate of return. The DCF analyst generally makes use of a formula in which the required rate of return is equal to the sum of the dividend yield (the dividend divided by the price) and the growth rate expected by investors.

The ALJ and the Commission both determined that the DCF method was appropriate here. The Commission placed primary weight on a direct DCF analysis of Otter Tail's own data, since its stock is publicly traded and its performance directly observable. The Commission also considered DCF analyses on comparable groups of utilities and other data to determine the reasonableness of the direct DCF analysis on Otter Tail's data.

The Commission adopted a 4 percent growth rate. In so doing, the Commission gave little weight to Emmen's recommended growth rate of 5.875 percent, since it was based solely upon dividend growth between 1976 and 1986, and did not consider past growth rates, trends in growth rates or current or future conditions. The Commission also noted that Emmen's growth rate lay outside the range of growth rates found by Thompson, Hass and Rudakas, which was 3 to 5 percent.

■ Focusing upon this range, the Commission looked at Otter Tail's historical growth rates. Thompson had found an average historical growth rate of 3.91 percent, and Rudakas had found an average of 3.5 percent. The Commission noted, however, that Otter Tail's past growth rate had been influenced by a decrease in earnings in 1980 and 1981, its 1981 payout ratio, and a very high earnings increase in 1982. The Commission noted that these events might not be expected in the future, and therefore examined the experts' estimates and projections for future sustainable growth. Dr. Hass reported the following analysts' growth projections:

> 4%—Institutional Brokers Estimate System (IBES)
> 3.4%—Value Line
> 4%—Value Line long-term growth estimate
> 5.5%—Salomon Brothers

The Commission concluded that, based on past growth and the above forecasts, a reasonable and appropriate growth rate for Otter Tail would be 4 percent. The Commission explained:

> The 4.00% rate is the midpoint of the 3.00% to 5.00% range supported by the analyses of Mr. Rudakas, Dr. Hass, and Dr. Thompson. It is in the range of growth predicted by investment analysts, and is precisely the same as the IBES estimate of 4.00%. The Commission finds the IBES prediction more reliable than that of any one investment advisory service, since it is made up of estimates from a variety of sources. Therefore, the Commission will use a 4.00% growth rate in the DCF cost of equity for OTP.

Otter Tail challenges the above findings, claiming that the Commission had no basis upon which to support its determination that the IBES prediction was more reliable than any of the other investment advisory

services. There is nothing in the record, however, demonstrating that the Commission's use of the IBES data was improper. This court should not substitute its judgment for that of the Commission. *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 825 (Minn.1977). As the supreme court stated in *Minnesota Power & Light Co. v. Minnesota Public Utilities Commission*, 342 N.W.2d 324 (Minn.1983):

> The analytical approach to be used in calculating a return on common equity is a matter for the agency's expertise.

*Id.* at 332. Not only the IBES estimate, but also the Value Line long-term growth estimate and Dr. Thompson's testimony supported the 4 percent figure; thus we believe substantial testimony supports the Commission's determination regarding the DCF analyses of Otter Tail's own data.

Otter Tail challenges Dr. Thompson's recommendation, claiming that his historical growth analysis skewed the figures, based upon the fact that many events in Otter Tail's past history were not likely to recur in the foreseeable future. The Commission, however, took this argument into consideration when it looked to the analyst's future growth predictions.

Combining the 4 percent expected growth rate with an 8 percent dividend yield,[3] the Commission found a cost of equity for Otter Tail of 12 percent. The Commission did not stop there, however, but considered whether this figure was reasonable when comparing other utility groups and evidence in the record.

The Commission first noted that the 12 percent figure was recommended by Dr. Thompson, and was approximately the midpoint of Dr. Hass' range of 11.6 to 12.6 percent based on a 12–month dividend yield period, and slightly higher than Hass' range of 10.8 percent to 11.8 percent based

on a six-month dividend yield. The Commission also found the 12 percent figure higher than Rudakas' range of 11 to 11.8 percent without his adjustment for selling costs, market pressure and market variations.[4]

The Commission next found that data underlying the comparable group analyses of both Dr. Hass and Dr. Thompson supported the 12 percent figure. The Commission put more weight on Thompson's analysis, rejecting the ALJ's finding that Hass' groups reflected Otter Tail's higher risk, due to its smaller size. The Commission specifically found that Otter Tail is not riskier than the typical electric utility, since its relatively small size is offset by such factors as a lack of nuclear exposure, a lack of need to construct new generating facilities, and an above-average fixed charge coverage. The Commission also noted that even if Otter Tail were more risky than the companies in Dr. Thompson's comparable group, Dr. Thompson's recommendation of a 12 percent rate of return on equity for Otter Tail was toward the upper end of his specific finding of an 11.25 percent return for his comparable group.

Finally, the Commission noted that DCF results from Dr. Hass' comparable group were quite similar to those from Dr. Thompson's group. Dr. Hass found a return on equity range of 10.6 to 12.6 percent for his comparable group using six- and twelve-month dividend yield periods, and 11.5 to 12.6 percent for his comparable group using only twelve-month yield periods, and the Commission noted that the 12 percent rate of return on equity was towards the upper end of Dr. Hass' broad comparable range and at the midpoint of his narrower range. Based on the above discussion, the Commission found that a 12

---

**3.** Otter Tail does not contest the Commissioner's determination that its dividend yield should be set at 8 percent. Indeed, this figure was the highest reasonable figure offered by the experts, and was based upon a thorough analysis of the testimony.

**4.** The Commission rejected Rudakas' adjustments for selling costs, market pressure, and market variation, noting that Dr. Hass and Dr.

Thompson had testified that no adjustments for selling costs or market pressure were necessary because Otter Tail was not planning a general public offering of common stock. The Commission also explained that a market variation risk was inherent in all equity investments, and therefore should not be an adjustment to dividend yields.

percent rate of return on common equity for Otter Tail was supported by the comparable group analyses of both Dr. Thompson and Dr. Hass. The Commission concluded that the makeup of the comparable groups and the relative riskiness of Otter Tail did not support putting greater weight on the upper end of Dr. Hass' DCF results for Otter Tail, as the ALJ had suggested.

Otter Tail challenges the Commission's findings regarding risk, and also argues that Thompson's comparable groups are not comparable to Otter Tail in risk, and that his averages were less reliable than those offered by Hass.

In *Minnesota Power & Light Co.*, the supreme court stated that the Commission's determination on growth rate is difficult to review because it is "not susceptible to precise verification on the evidentiary record due to its judgmental nature." 342 N.W.2d at 330. The supreme court quoted the following language from Hamilton and Colacci, *Judicial Review of Utility Rate-making in Minnesota: An Analysis and a Proposal,* 8 Wm. Mitchell Law Review 543, 556–57 (1982):

> Determination of growth rate necessarily involve predictions, assumptions and judgments. No matter how many hard data are available in the form of historical trends, market conditions or the status of the utility as a mature versus expanding enterprise, the ultimate decision of the commission is necessarily based on agency judgment and expertise.

*Id.* The *Minnesota Power and Light* court concluded:

> Thus, when applying the substantial evidence test to that type of finding, the reviewing court should determine whether the agency has adequately explained how it derived its conclusion and whether that conclusion is reasonable on the basis of the record.

*Id.*

■ In view of this limited scope of review, we believe the Commission's determination regarding risk should be upheld. Summaries of Dr. Hass' and Dr. Thompson's analyses regarding comparable groups indicate problems with both groups. However, there is substantial evidence supporting the Commission's determination.

We specifically note that Dr. Hass' figures regarding total 1985 capital do not support a conclusion that larger companies are less risky than smaller companies such as Otter Tail. On the contrary, Dr. Hass' figures indicate that size of a company alone does not necessarily support a finding of higher risk.[5]

In addition, although Dr. Hass' median figures across the board would appear to support a conclusion that a smaller company is more risky because the ratings are lower, in fact when the smallest and second smallest company's individual ratings are considered, those ratings are often higher than those of the largest and second largest companies. Thus, Dr. Hass' figures do not support the argument that size of a company is necessarily an indicator of risk.

The Commission found that even if Otter Tail's relatively small size might tend to make it riskier, the size factor is more than offset by such factors as Otter Tail's lack of nuclear exposure,[6] lack of need to construct new generating facilities, and above-average fixed charge coverage. In addition, the Commission supported its finding by looking at the FERC benchmark rate[7] of 13.08 percent (capped at 13.25 percent) for May through July 1986, dropping to

---

**5.** Hass' two largest utilities had a cost of common equity of 10.5 percent and 11.6 percent based on six-month data and 11.4 percent and 12.5 percent based on 12–month data, while the smallest utility on Hass' list had a cost of common equity of 10.5 percent based on six-month data and 11.3 percent based on 12–month data. The figures for the smallest utility were thus either equal to or slightly below the cost of common equity for the two largest companies. In addition, the second smallest company had a cost of common equity of 11.3 percent based on

six-month data and 12.1 percent based on 12–month data.

**6.** Dr. Hass testified, however, that the average utility does not have nuclear exposure.

**7.** The FERC (Federal Energy Regulatory Commission) uses a form of DCF analysis based on a sample of 100 utilities to derive its benchmark rate of return. This rate is updated quarterly to reflect changes in dividend yield.

12.18 percent (capped at 12.75 percent) for August through October, and dropping further to 11.43 percent (capped at 12.25 percent) for November through January 1987. The Commission found that this trend also supported the reasonableness of a 12 percent return.

■ While the evidence is conflicting, in view of our limited scope of review, we adopt the Commission's finding regarding risk and conclude that the lower rate of return on common equity is supported by substantial evidence in the record.

### 4. Canceled Spiritwood Project

Otter Tail requested rate base treatments of the canceled Spiritwood project. The Department of Public Safety, Attorney General and Superwood recommended that the Spiritwood project be totally excluded from rate base treatment because it was never "used and useful" in providing service.

The legislature has stated:

The Commission * * * shall give due consideration to the public need for adequate, efficient, and reasonable service and to the need of the public utility for revenue sufficient to enable it to meet the cost of furnishing the service, including adequate provision for depreciation of its utility property *used and useful* in rendering service to the public, and to earn a fair and reasonable return upon the investment in such property. In determining the rate base upon which the utility is to be allowed to earn a fair rate of return, the commission shall give due consideration to evidence of the cost of the property when first devoted to *public use,* to prudent acquisition cost to the public utility less appropriate depreciation on each, * * * and to other expenses of a capital nature * * *.

Minn.Stat. § 216B.16, subd. 6 (emphasis supplied).

The ALJ determined that Otter Tail should be allowed to include planning and engineering expenditures for Spiritwood in its rate base, but also recommended that rate base treatment for land and other costs be disallowed. The ALJ found that

the decision to invest was prudent and stated that prudent planning costs are "used and useful in rendering service to the public" whether or not a project is completed. The ALJ reasoned:

Planning and engineering costs such as that spent by Otter Tail Power on the Spiritwood project are "reasonably necessary for the provision of service", and should be given "due consideration to the public need for adequate, efficient and reasonable service" within the meaning of the applicable statute.

The Commission rejected the ALJ's analysis, quoting from *Senior Citizens Coalition of Northern Minnesota v. Minnesota Public Utilities Commission,* 355 N.W.2d 295 (Minn.1984):

Under general principles of utility law, the "used and useful" standard simply requires (1) that the property be "in service," and (2) that "it 'be reasonably necessary' to the efficient and reliable provision of utility service".

*Id.* at 300 (citations and footnote omitted). The *Senior Citizens* court held that recreational facilities which were mandated by the Federal Energy Regulatory Commission (FERC) were "used and useful" within the meaning of the above statute.

The Commission found that the Spiritwood project was not used and useful because the plant was never "in service," and because the costs never proved "reasonably necessary to the efficient and reliable provision of utility service," as required by *Senior Citizens.* The Commission stated:

To consider such a nonexistent plant as used and useful is an unreasonable expansion of the used and useful concept. The plant in question has not provided and never will provide electricity to rate payers.

\*     \*     \*     \*     \*     \*

However, an investment may be prudent even though the property does not satisfy the used and useful standard stated above * * *. These are distinct factors that must be separately considered and balanced when determining the reason-

ableness of including abandoned property in rate base.

■ We conclude that the Commission's analysis comports with *Senior Citizens* and the language of the statute, and also tracks the policy of FERC:

FERC's policy on the ratemaking treatment of abandonment losses is now well settled. The utility has the initial burden to show that its decision to build and later cancel the plant were prudent. Having met this burden, investors and ratepayers will "share" in the loss; ratepayers by paying in rates for the investment loss [amortization], investors by not earning a return on [receiving rate base treatment of] the investment.

Wilson, *Ratemaking Treatment of Abandoned Generating Plant Losses*, 8 Wm. Mitchell Law Rev. 343, 351 (1982).

Our review of other jurisdictions indicates that they are divided on this issue. We recognize that persuasive arguments may be made both in support of permitting rate base treatment of the Spiritwood investment and denying such treatment. Public policy concerns prevent us from strongly endorsing the Commission's reasoning. While disallowance of rate base treatment in the short term will result in lower rates, in the long term it is virtually certain that denial of such recovery will affect the risk of investment in public utilities, thereby driving up the costs of capital.

Thus, while we affirm the Commission on this issue, we do so with some hesitation. Nonetheless, we are persuaded that any contrary interpretation of the statute and the *Senior Citizens* decision must be announced either by our supreme court or by the legislature.

## DECISION

The Commission's decision is in all respects affirmed.

Affirmed.

## ORDER

Based upon the file, records and proceedings herein, and because:

1. By opinion filed December 15, this court reviewed a rate proceeding, affirming in part and reversing in part; and

2. The opinion was signed by the undersigned on Wednesday, December 2, but did not meet the 4:00 p.m. deadline for decisions to be released the following Tuesday, December 8; and

3. The opinion was promptly forwarded to the Clerk of the Appellate Courts, with all other opinions prepared by 4:00 p.m. on Wednesday, December 9, for release on December 15; and

4. The December 15 opinions, which did not become public information until 12:01 a.m. on that date, were mailed to counsel, Finance & Commerce, West Publishing and the media on Friday, December 11; and

5. Also on December 11, the supreme court released its opinion in *In re Petition of Northern States Power Co.*, 416 N.W.2d 719, C7–86–1482, (1987) and provided guidance on one of the issues addressed in this court's opinion on this appeal; and

6. In light of the supreme court's decision, revision of our December 15 opinion is appropriate;

IT IS HEREBY ORDERED:

1. The opinion filed December 15 in this matter is withdrawn.

2. The attached opinion, signed on December 29, is substituted and shall be filed on January 5, 1988.